**MASSACHUSETTS MEDICAL SOCIETY, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Appellant.**

**No. 74–1426.**

United States Court of Appeals, First Circuit.

Argued March 3, 1975.

Decided April 16, 1975.

William A. Friedlander, Atty., Tax Div., Dept. of Justice, with whom Scott P. Crampton, Asst. Atty. Gen., Washington, D. C., James N. Gabriel, U. S. Atty., James J. O'Leary, Asst. U. S. Atty., Boston, Mass., Gilbert E. Andrews, and Leonard J. Henzke, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief for appellant.

Robert J. McGee, Boston, Mass., with whom Palmer & Dodge, Boston, Mass., was on brief, for plaintiff-appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

Taxpayer, a corporation exempt from income taxes under § 501(c)(6) of the Internal Revenue Code, publishes the New England Journal of Medicine, an activity admittedly related to its educational purpose. In 1968 the Commissioner, citing newly adopted regulations, asserted deficiencies against taxpayer on the ground that the profits from advertising in the Journal constituted taxable income of an unrelated trade or business as defined by then Int.Rev.Code §§ 511–13.[1] Taxpayer paid the deficiency and

---

1. Section 511 imposed a tax on charitable organizations' unrelated business income, defined by § 512 as their income, net of deductions, derived from any unrelated trade or business. Section 513(a) provided:

"*Unrelated trade or business*

"(a) *General Rule.*—The term 'unrelated trade or business' means, in the case of any organization subject to the tax imposed by section 511, any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption under section 501 . . . ."

brought the instant suit for refund, and the court granted its motion for summary judgment. Taxpayer acknowledges that its advertising activities come within the new regulations' definition of an unrelated trade or business, 26 C.F.R. § 1.513–1(b) and (d)(4)(iv), examples 6 and 7, but challenges the definition's validity as an interpretation of the statute under which it was promulgated seventeen years later.[2]

■ We concur in the virtually unanimous opinion of commentators that the 1967 regulations contravene the congressional intent in fragmenting an integrated enterprise into its constituent "activities" in search of an unrelated trade or business under § 513(a).[3] The impetus for the original legislation lay in fears occasioned by a rash of acquisitions like New York University's of the Mueller Macaroni Co., of a spiraling cycle in which exempt institutions would acquire unrelated businesses on favorable payout terms and use their exemptions to undercut commercial competitors, forcing some out of business and increasing the tax burden on the remainder. In his message to Congress in 1950, President Truman sought legislation to correct "the few glaring abuses of the tax exemption privilege," stating that it had been "misused in a few instances to gain competitive advantage over private enterprise through the conduct of business and industrial operations entirely unrelated to educational activities." Hearings on Revenue Revision Before the House Comm. on Ways and Means, 81st Cong., 2d Sess. 4, 5 (1950). Secretary of the Treasury Snyder testified that the abuses aimed at included business undertakings like the production of automobile parts, china-ware, food products and the operation of theatres, oil wells and cotton gins. *Id.* at 18, 19. The examples of the operations to which the tax would or would not be applied that are furnished in the Committee reports, H.R.Rep.No. 2319, 81st Cong., 2d Sess. 36–37 (1950), S.Rep.No.2375, 81st Cong., 2d Sess. 29, 107 (1950), U.S.Code Cong.Serv.1950, p.

In 1969 Congress prospectively amended these sections, Pub.L.No.91–172, 83 Stat. 536, to validate the Commissioner's regulations, which had evoked great controversy. Hence our decision is without effect as to tax years other than those beginning between December 13, 1967 (the effective date of the new regulations) and December 31, 1969 (the effective date of the statutory amendments) inclusive. The opinion of the 1969 Congress, if any, as to the validity of the regulations as an interpretation of the statute enacted by another Congress in 1950 is entitled to little or no weight. United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968).

2. By and large the Service did not seek to tax advertising income of exempt publications under the regulations in force during this period, though there was some variation among the regional offices in this regard, and in fact issued an unpublished ruling to one exempt organization to this effect. See generally Lehrfeld, The Unfairness Doctrine: Commercial Advertising Profits as Unrelated Business Income, 23 Tax Law. 349 (1970). While the Service never formally adopted this position, we think that its long-standing quiescence provides some support for our reading of the congressional intent *infra*.

3. *See e. g.*, Cooper, Trends in the Taxation of Unrelated Business Activity, 29 N.Y.U.Inst. on Fed.Tax. 1999, 2009 (1970); Ellicott, Proposed Changes in the Taxation of Advertising Income of Exempt Organization Publications, 2 The Tax Adviser 710 (1971); Middleditch & Webster, The New Unrelated Business Income Regs.: What They Mean; How to Cope With Them, 28 J.Tax. 174 (1968); Moore, Current Problems of Exempt Organizations, 24 Tax L.Rev. 469, 469–76 (1969); Weithorn & Liles, Unrelated Business Income Tax: Changes Affecting Journal Advertising Revenues, 45 Taxes 791 (1967); Note, The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations, 81 Harv.L. Rev. 1280, 1291–92, 1294 (1968). *But see* Lehrfeld, *supra* (regulations may be supportable).

In fact, in an internal memorandum to the Assistant Commissioner (Technical), G.C.M. 29620 (1956), the Service's Chief Counsel took the view that advertising was a normal part of a journal and could not viably be published separately absent the reader appeal provided by the editorial matter, hence it would be unrealistic and unjustified to view the entire publishing operation as other than a single business. While this opinion is not binding on the Commissioner, Bookwalter v. Brecklein, 357 F.2d 78, 82 (8th Cir. 1966), it is of some value, as a contemporaneous viewpoint from a source with some interest and expertise in the area, in divining the congressional intent.

3053, contemplate integrated "enterprises"—a university press, the manufacture and sale of tires, an agricultural college's wheat farm, the operation of university athletic programs, dining halls, or dormitories—even though unrelated profit-producing "activities" could probably have been distilled from such enterprises.[4] Hence the regulation's flat equation of a trade or business with any activity albeit conducted as an integral part of an exempt enterprise finds little support in the legislative history.[5] Rather, that history and the immediate background against which the legislation was enacted suggest a fairly limited measure designed to distinguish the customary activities of exempt organizations from the "abuses," the unusual ones that had latterly appeared. See Note, The Macaroni Monopoly, supra at 1291. The publication of advertising in exempt educational journals was a well established practice even then; we do not believe Congress intended to treat it on par with, e. g., an independently run advertising placement agency.

The Commissioner notes that the House report, supra at 109, likened the phrase "trade or business" to the same phrase appearing in present § 162 (governing deductions for business expenses) and argues that the sale of advertising space in a periodical could be conducted as a business within that definition. While this is undoubtedly true, the integrated publication of a magazine including advertising would qualify as a "trade or business" too, and the Commissioner cites no § 162 precedent for fragmenting an operation run as an integrated whole into its component parts. Although this reference in the report provides a test for judging activities, it is at best irrelevant to the particular question of the scope of the activity to which the test should be applied; at worst, it is an indication that the Service was to approach the taxpayer as it does under § 162, without such fragmentation in mind. Indeed, the committee report also refers to definitions of trade or business found elsewhere in the Code, and in instances where it is important to determine whether a particular activity is a business in its own right or part of another, the Commissioner has eschewed any notion of fragmentation in his interpretations.[6] The Commissioner also contends that his policy would further Congress' stated purpose of preventing unfair competition since taxpayer's publication competes for advertising with other non-exempt publications aimed at the same market. But in view of the considerations detailed above we doubt that Congress would have considered the competitive advantage enjoyed in this traditional realm of exempt undertaking to be unfair. Finally, the Commissioner seeks support for his interpretation in the statement in the House Report that it

---

4. Thus a university press might sell advertising in its publications and the sale of wheat produced by a wheat farm is an activity not necessarily related to the farm's educational purpose. That Congress overlooked these possibilities indicates that it did not intend to use "trade or business" in the Commissioner's fragmented sense.

5. Though the term "activity" appears a few times in the committee reports, the same Congress had earlier let die in committee a bill, H.R. 5064, 81st Cong., 1st Sess. (1949), which would have taxed income derived from "any activity of a kind which is recognized as an ordinary trade or business activity commonly engaged in by other persons for profit." This may be some indication that Congress considered the activity approach overly strict.

6. See 26 C.F.R. § 1.270–1(a)(4) (1974) (in defining trade or business for purposes of former § 270 limiting deductions for each such trade or business, taxpayer must establish that "business activities are actually conducted separately and are not closely interrelated with each other" to claim them as separate businesses). See also 26 C.F.R. § 1.355–1(c) (1974) defining trade or business for purposes of the partial liquidation and spinoff provisions of the Code, §§ 346 and 355, as a "group of activities . . . including every operation which forms a part of, or a step in, the process of earning income or profit from such group." While the latter two provisions did not exist at the time of the congressional reference, and all three involve situations where the taxpayer will customarily be seeking to fragment activities rather than to group them (as does § 162), they provide some indication of the accepted sense of the concept.

did not matter whether the unrelated trade or business was conducted through a subsidiary organization or the exempt organization itself. But the distinction at issue here is not the arbitrary one of the legal form in which an activity is conducted, but rather the nature of the activity itself and its relation to the exempt activity.

The problematical nature of the regulations' attempt to treat taxpayer's advertising activities as a separate business is apparent in their handling of deductions. The statute limits deductions to those "directly connected" with the unrelated business, § 512(a), and the regulation defines these as deductions having "a proximate and primary relationship" to the business, § 1.512(a)–1(a). If the advertising function is construed to constitute a separate unrelated business, expenses of the collateral editorial business would not seem to satisfy this criterion.[7] Yet if no deduction were allowed for such expenses exempt organizations like the taxpayer would be in a less favorable position than non-exempt organizations publishing magazines, which may deduct all their expenses, both advertising and editorial. It is doubtful that Congress would have approved such an anomalous result. Implicitly recognizing this the regulations provide a special definition of direct connection, see § 1.512(a)–1(a) and (d)(2), allowing deduction of expenses entirely attributable to the exempt activities and possessing no proximate or primary relationship to the unrelated trade or business from income derived from the unrelated business whenever the activity is of a type normally conducted by taxable organizations in pursuance of such a business. Thus two ostensibly unrelated businesses are nonetheless treated as directly connected on the ground that non-exempt organizations customarily conduct them together. The necessity for such an at the time unprecedented interpretation militates against reading the 1950 statute to envision fragmenting operations customarily conducted as an integrated whole.

On the basis of these considerations we conclude that the regulations impermissibly enlarge the scope of the provisions under which they were promulgated. Campbell v. Galeno Chemical Co., 281 U.S. 599, 610, 50 S.Ct. 412, 74 L.Ed. 1063 (1930).

Affirmed.

---

7. The regulations acknowledge this by providing that "except as provided in paragraph (d)(2) of this section [containing a special definition discussed below]" direct connection is defined in the terms cited in the text.