# UNITED STATES v. AMERICAN COLLEGE OF PHYSICIANS

No. 84–1737.   Argued January 21, 1986—Decided April 22, 1986

MARSHALL, J., delivered the opinion for a unanimous Court. BURGER, C. J., filed a concurring opinion, in which POWELL, J., joined, *post*, p. 850.

*Albert G. Lauber, Jr.*, argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Archer, Robert A. Bernstein*, and *Robert S. Pomerance*.

*John B. Huffaker* argued the cause for respondent. With him on the brief were *Eleanor N. Ewing* and *Gerald P. Norton.**

JUSTICE MARSHALL delivered the opinion of the Court.

A tax-exempt organization must pay tax on income that it earns by carrying on a business not "substantially related" to the purposes for which the organization has received its exemption from federal taxation. The question before ·this Court is whether respondent, a tax-exempt organization,

---

*Robert A. Saltzstein* and *Joseph J. Saunders* filed a brief for American Business Press as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Association for the Advancement of Science by *John D. Lane;* for the American Medical Association et al. by *George A. Platz, Frank V. Battle, Jr., J. Timothy Kleespies*, and *Kathleen R. Curtis;* and for the American Society of Association Executives by *George D. Webster* and *Frank M. Northam.*

must pay tax on the profits it earns by selling commercial advertising space in its professional journal, The Annals of Internal Medicine.

## I

Respondent, the American College of Physicians, is an organization exempt from taxation under § 501(c)(3) of the Internal Revenue Code.[1] The purposes of the College, as stated in its articles of incorporation, are to maintain high standards in medical education and medical practice; to encourage research, especially in clinical medicine; and to foster measures for the prevention of disease and for the improvement of public health. App. 16a. The principal facts were stipulated at trial. In furtherance of its exempt purposes, respondent publishes The Annals of Internal Medicine (Annals), a highly regarded monthly medical journal containing scholarly articles relevant to the practice of internal medicine. Each issue of Annals contains advertisements for pharmaceuticals, medical supplies, and equipment useful in the practice of internal medicine, as well as notices of positions available in that field. Respondent has a longstanding policy of accepting only advertisements containing information about the use of medical products, and screens proffered advertisements for accuracy and relevance to internal medicine. The advertisements are clustered in two groups, one at the front and one at the back of each issue.

In 1975, Annals produced gross advertising income of $1,376,322. After expenses and deductible losses were subtracted, there remained a net income of $153,388. Respondent reported this figure as taxable income and paid taxes on it in the amount of $55,965. Respondent then filed a timely claim with the Internal Revenue Service for refund of these

---

[1] Title 26 U. S. C. § 501(c)(3) exempts from taxation entities "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes," with certain restrictions on their activities, including prohibition of political activity.

taxes, and when the Government demurred, filed suit in the United States Claims Court.

The Claims Court held a trial and concluded that the advertisements in Annals were not substantially related to respondent's tax-exempt purposes. 3 Cl. Ct. 531 (1983). Rather, after finding various facts regarding the nature of the College's advertising business, it concluded that any correlation between the advertisements and respondent's educational purpose was incidental because "the comprehensiveness and content of the advertising package is entirely dependent on each manufacturer's willingness to pay for space and the imagination of its advertising agency." *Id.*, at 535. Accordingly, the court determined that the advertising proceeds were taxable.

The Court of Appeals for the Federal Circuit reversed. 743 F. 2d 1570 (1984). It held clearly erroneous the trial court's finding that the advertising was not substantially related to respondent's tax-exempt purpose. The Court of Appeals believed that the trial court had focused too much on the commercial character of the advertising business and not enough on the actual contribution of the advertisements to the education of the journal's readers. It held that respondent had established the requisite substantial relation and its entitlement to exemption from taxation. *Id.*, at 1578. We granted the Government's petition for certiorari, 473 U. S. 904 (1985), and now reverse.

## II

The taxation of business income not "substantially related" to the objectives of exempt organizations dates from the Revenue Act of 1950, Ch. 994, 64 Stat. 906 (1950 Act). The statute was enacted in response to perceived abuses of the tax laws by tax-exempt organizations that engaged in profit-making activities. Prior law had required only that the profits garnered by exempt organizations be used in furtherance of tax-exempt purposes, without regard to the source of

those profits. See *Trinidad* v. *Sagrada Orden de Predi-cadores*, 263 U. S. 578, 581 (1924); *C. F. Mueller Co.* v. *Com-missioner*, 190 F. 2d 120 (CA3 1951); *Roche's Beach, Inc.* v. *Commissioner*, 96 F. 2d 776 (CA2 1938). As a result, tax-exempt organizations were able to carry on full-fledged com-mercial enterprises in competition with corporations whose profits were fully taxable. See Revenue Revision of 1950: Hearings before the House Committee on Ways and Means, Vol. I, 81st Cong., 2d Sess., 18–19 (1950) (hereinafter cited as 1950 House Hearings) (describing universities' production of "automobile parts, chinaware, and food products, and the op-eration of theatres, oil wells, and cotton gins"). Congress perceived a need to restrain the unfair competition fostered by the tax laws. See H. R. Rep. No. 2319, 81st Cong., 2d Sess., 36–37 (1950).

Nevertheless, Congress did not force exempt organizations to abandon all commercial ventures, nor did it levy a tax only upon businesses that bore no relation at all to the tax-exempt purposes of an organization, as some of the 1950 Act's pro-ponents had suggested. See, *e. g.*, 1950 House Hearings, at 4, 19, 165. Rather, in the 1950 Act it struck a balance be-tween its two objectives of encouraging benevolent enter-prise and restraining unfair competition by imposing a tax on the "unrelated business taxable income" of tax-exempt orga-nizations. 26 U. S. C. § 511(a)(1).

"Unrelated business taxable income" was defined as "the gross income derived by any organization from any unrelated trade or business . . . regularly carried on by it . . . ." § 512(a)(1). Congress defined an "unrelated trade or busi-ness" as "any trade or business the conduct of which is not substantially related . . . to the exercise or performance by such organization of its charitable, educational, or other pur-pose or function constituting the basis for its exemption . . . ." § 513(a). Whether respondent's advertising income is taxable, therefore, depends upon (1) whether the publica-tion of paid advertising is a "trade or business," (2) whether it

is regularly carried on, and (3) whether it is substantially related to respondent's tax-exempt purposes.

### III

### A

Satisfaction of the first condition is conceded in this case, as it must be, because Congress has declared unambiguously that the publication of paid advertising is a trade or business activity distinct from the publication of accompanying educational articles and editorial comment.

In 1967, the Treasury promulgated a regulation interpreting the unrelated business income provision of the 1950 Act. The regulation defined "trade or business" to include not only a complete business enterprise, but also any component activity of a business. Treas. Reg. § 1.513–1(b), 26 CFR § 1.513–1(b) (1985) (first published at 32 Fed. Reg. 17657 (1967)).[2] This revolutionary approach to the identification of a "trade or business" had a significant effect on advertising, which theretofore had been considered simply a part of a unified publishing business. The new regulation segregated the "trade or business" of selling advertising space from the "trade or business" of publishing a journal, an approach commonly referred to as "fragmenting" the enterprise of publishing into its component parts:

> "[A]ctivities of soliciting, selling, and publishing commercial advertising do not lose identity as a trade or business even though the advertising is published in an exempt organization periodical which contains editorial matter related to the exempt purposes of the organization." 26 CFR § 1.513–1(b) (1985).

---

[2] The 1967 Treasury regulations at issue in this case, published in final form at 32 Fed. Reg. 17657 (1967), have not been amended in pertinent part since their promulgation, and references to those regulations herein are to the current version.

In 1969, Congress responded to widespread criticism of those Treasury regulations[3] by passing the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487 (1969 Act). That legislation specifically endorsed the Treasury's concept of "fragmenting" the publishing enterprise into its component activities, and adopted, in a new § 513(c), much of the language of the regulation that defined advertising as a separate trade or business:

> "Advertising, etc., activities . . . an activity does not lose identity as a trade or business merely because it is carried on . . . within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization." 26 U. S. C. § 513(c).

The statute clearly established advertising as a trade or business, the first prong of the inquiry into the taxation of unrelated business income.

The presence of the second condition, that the business be regularly carried on, is also undisputed here. The satisfaction of the third condition, however, that of "substantial rela-

---

[3] See, e. g., Moore, Current Problems of Exempt Organizations, 24 Tax L. Rev. 469, 476 (1969); Middleditch & Webster, The new unrelated business income Regs: what they mean; how to cope with them, 28 J. Tax. 174, 178 (1968); Webster, New proposals change definition of unrelated business income, 27 J. Tax. 42, 43 (1967); Weithorn & Liles, Unrelated Business Income Tax: Changes Affecting Journal Advertising Revenues, 45 Taxes 791, 798 (1967). See also Tax Reform, 1969: Hearings before the House Committee on Ways and Means, 91st Cong., 1st Sess., 1129, 1184, 1223 (1969). Numerous bills were introduced in the 90th Congress, 1st Session, in an unsuccessful attempt to overturn the regulations, even before they became final. See, e. g., H. R. 8765; H. R. 8766; H. R. 9103; H. R. 9468; H. R. 9661; H. R. 9763; H. R. 10150; H. R. 10997; H. R. 10998; H. R. 11491; H. R. 11492. And several years later, two federal courts struck down the 1967 regulations as exceeding pre-1969 statutory authority, insofar as they required the "fragmentation" of publishing activities. See American College of Physicians v. United States, 209 Ct. Cl. 23, 29, 530 F. 2d 930, 933 (1976); Massachusetts Medical Society v. United States, 514 F. 2d 153, 154 (CA1 1975).

tion," is vigorously contested, and that issue forms the crux of the controversy before us.

## B

According to the Government, Congress and the Treasury established a blanket rule that advertising published by tax-exempt professional journals can never be substantially related to the purposes of those journals and is, therefore, always a taxable business. Respondent, however, contends that each case must be determined on the basis of the characteristics of the advertisements and journal in question. Each party finds support for its position in the governing statute and regulations issued by the Department of the Treasury.

In its 1967 regulations, the Treasury not only addressed the "fragmentation" issue discussed above, but also attempted to clarify the statutory "substantially related" standard found in § 513(a). It provided that the conduct of a tax-exempt business must have a causal relation to the organization's exempt purpose (other than through the generation of income), and that "the production or distribution of the goods or the performance of the services from which the gross income is derived must *contribute importantly* to the accomplishment of [the exempt] purposes." Treas. Reg. § 1.513–1(d)(2), 26 CFR § 1.513–1(d)(2) (1985) (emphasis added). In illustration of its new test for substantial relation, the Treasury provided an example whose interpretation is central to the resolution of the issue before us. Example 7 of Treas. Reg. § 1.513–1(d)(4)(iv) involves "Z," an exempt association formed to advance the interests of a particular profession and drawing its membership from that profession. Z publishes a monthly journal containing articles and other editorial material that contribute importantly to the tax-exempt purpose. Z derives income from advertising products within the field of professional interest of the members:

"Following a practice common among taxable magazines which publish advertising, Z requires its advertising to comply with certain general standards of taste, fairness, and accuracy; but within those limits the form, content, and manner of presentation of the advertising messages are governed by the basic objective of the advertisers to promote the sale of the advertised products. While the advertisements contain certain information, the informational function of the advertising is incidental to the controlling aim of stimulating demand for the advertised products and differs in no essential respect from the informational function of any commercial advertising. Like taxable publishers of advertising, Z accepts advertising only from those who are willing to pay its published rates. Although continuing education of its members in matters pertaining to their profession is one of the purposes for which Z is granted exemption, the publication of advertising designed and selected in the manner of ordinary commercial advertising is not an educational activity of the kind contemplated by the exemption statute; it differs fundamentally from such an activity both in its governing objective and in its method. Accordingly, Z's publication of advertising does not contribute importantly to the accomplishment of its exempt purposes; and the income which it derives from advertising constitutes gross income from unrelated trade or business." § 1.513–1(d)(4)(iv), Example 7.

The Government contends both that Example 7 creates a *per se* rule of taxation for journal advertising income and that Congress intended to adopt that rule, together with the remainder of the 1967 regulations, into law in the 1969 Act. We find both of these contentions unpersuasive.

Read as a whole, the regulations do not appear to create the type of blanket rule of taxability that the Government urges upon us. On the contrary, the regulations specifically condition tax exemption of business income upon the impor-

tance of the business activity's contribution to the particular exempt purpose at issue, and direct that "[w]hether activities productive of gross income contribute importantly to the accomplishment of any purpose for which an organization is granted an exemption depends *in each case* upon the facts and circumstances involved," § 1.513–1(d)(2) (emphasis added).   Example 7 need not be interpreted as being inconsistent with that general rule.   Attributing to the term "example" its ordinary meaning, we believe that Example 7 is best construed as an illustration of one possible application, under given circumstances, of the regulatory standard for determining substantial relation.

The interpretative difficulty of Example 7 arises primarily from its failure to distinguish clearly between the statements intended to provide hypothetical facts and those designed to posit the necessary legal consequences of those facts.   Just at the point in the lengthy Example at which the facts would appear to end and the analysis to begin, a pivotal statement appears: "the informational function of the advertising is incidental to the controlling aim of stimulating demand for the advertised products."   The Government's position depends upon reading this statement as a general proposition of law, while respondent would read it as a statement of fact that may be true by hypothesis of "Z" and its journal, but is not true of Annals.

We recognize that the language of the Example is amenable to either interpretation.   Nevertheless, several considerations lead us to believe that the Treasury did not intend to set out a *per se* statement of law.   First, when the regulations were proposed in early 1967, the Treasury expressed a clear intention to treat all commercial advertising as an unrelated business.   See Technical Information Release No. 889, CCH 1967 Stand. Fed. Tax Rep. ¶ 6557.   When the regulations were issued in final form, however, following much criticism and the addition of Example 7, they included no such statement of intention.   32 Fed. Reg. 17657 (1967).   Second,

a blanket rule of taxation for advertising in professional journals would contradict the explicit case-by-case requirement articulated in Treas. Reg. § 1.513–1(d)(2), and we are reluctant to attribute to the Treasury an intention to depart from its own general principle in the absence of clear support for doing so. Finally, at the time the regulations were issued, the 1950 Act had been interpreted to mean that business activities customarily engaged in by tax-exempt organizations would continue to be considered "substantially related" and untaxed. See Note, The Macaroni Monopoly: The Developing Concept of Unrelated Business Income of Exempt Organizations, 81 Harv. L. Rev. 1280, 1291 (1968). A *per se* rule of taxation for the activity, traditional among tax-exempt journals, of carrying commercial advertising would have been a significant departure from that prevailing view. Thus, in 1967 the idea of a *per se* rule of taxation for all journal advertising revenue was sufficiently controversial, its effect so substantial, and its statutory authorization so tenuous, that we simply cannot attribute to the Treasury the intent to take that step in the form of an ambiguous example, appended to a subpart of a subsection of a subparagraph of a regulation.

It is still possible, of course, that, regardless of what the Treasury actually meant by its 1967 regulations, Congress read those regulations as creating a blanket rule of taxation, and intended to adopt that rule into law in the 1969 Act. The Government appears to embrace this view, which it supports with certain statements in the legislative history of the 1969 Act. For example, the Government cites to a statement in the House Report, discussing the taxation of advertising income of journals published by tax-exempt organizations:

> "Your committee believes that a business competing with taxpaying organizations should not be granted an unfair competitive advantage by operating tax free unless the business contributes importantly to the exempt function. It has concluded that by that standard, ad-

vertising in a journal published by an exempt organiza-
tion is not related to the organization's exempt functions,
and therefore it believes that this income should be
taxed." H. R. Rep. No. 91–413, pt. 1, p. 50 (1969).

Similar views appear in the Senate Report:

"Present law. — In December 1967, the Treasury De-
partment promulgated regulations under which the in-
come from advertising and similar activities is treated as
'unrelated business income' even though such advertis-
ing for example may appear in a periodical related to the
educational or other exempt purpose of the organization.

"General reasons for change. — The committee agrees
with the House that the regulations reached an appropri-
ate result in specifying that when an exempt organiza-
tion carries on an advertising business in competition
with other taxpaying advertising businesses, it should
pay a tax on the advertising income. The statutory
language on which the regulations are based, however,
is sufficiently unclear so that substantial litigation could
result from these regulations. For this reason, the
committee agrees with the House that the regulations,
insofar as they apply to advertising and related activi-
ties, should be placed in the tax laws." S. Rep. No.
91–552, p. 75 (1969).

Based on this language, the Government argues that the
1969 Act created a *per se* rule of taxation for advertising
income. The weakness of this otherwise persuasive argu-
ment, however, is that the quoted discussion appears in the
Reports solely in support of the legislators' decision to enact
§ 513(c), the provision approving the fragmentation of "trade
or business." Although § 513(c) was a significant change in
the tax law that removed one barrier to the taxation of ad-
vertising proceeds, it cannot be construed as a comment upon
the two other distinct conditions — "regularly carried on" and
"not substantially related" — whose satisfaction is prereq-

uisite to taxation of business income under the 1950 Act. Congress did not incorporate into the 1969 Act the language of the regulation defining "substantial relation," nor did the statute refer in any other way to the issue of the relation between advertising and exempt functions, even though that issue had been hotly debated at the hearings.   See, *e. g.*, Tax Reform, 1969: Hearings before the House Committee on Ways and Means, 91st Cong., 1st Sess., 1113, 1118, 1192, 1241 (1969).   Thus, we have no reason to conclude from the Committee Reports that Congress resolved the dispute whether, in a specific case, a journal's carriage of advertising could so advance its educational objectives as to be "substantially related" to those objectives within the meaning of the 1950 Act.

It is possible that the Committees' discussion of advertising reflects merely an erroneous assumption that the "fragmentation" provision of § 513(c), without more, would establish the automatic taxation of journal advertising revenue. Alternatively, the quoted passages could be read to indicate the Committees' intention affirmatively to endorse what they believed to be existing practice, or even to change the law substantially.   The truth is that, other than a general reluctance to consider commercial advertisements generally as substantially related to the purposes of tax-exempt journals, no congressional view of the issue emerges from the quoted excerpts of the Reports.[4]   Thus, despite the Reports' seeming endorsement of a *per se* rule, we are hesitant to rely on that inconclusive legislative history either to supply a provision *not* enacted by Congress, see *Commissioner* v. *Acker*,

---

[4] Indeed, different excerpts suggest that perhaps the House Committee did not construe the statute as creating a *per se* rule.   In its explanation of § 513(c), the House Report states that "the advertising contained in a publication of an exempt organization *may* be subject to the tax under section 511 even though the editorial content of the publication may be related to the exempt purposes of the organization."   H. R. Rep. No. 91–413, pt. 2, p. 26 (1969) (emphasis added).

361 U. S. 87, 93 (1959); 1 J. Mertens, Law of Federal Income Taxation § 3.29 (Weinstein rev. 1985), or to define a statutory term enacted by a prior Congress. See *SEC* v. *Sloan*, 436 U. S. 103, 121 (1978); *United States* v. *Price*, 361 U. S. 304, 313 (1960). Cf. *TVA* v. *Hill*, 437 U. S. 153, 193 (1978). We agree, therefore, with both the Claims Court and the Court of Appeals in their tacit rejection of the Government's argument that the Treasury and Congress intended to establish a *per se* rule requiring the taxation of income from all commercial advertisements of all tax-exempt journals without a specific analysis of the circumstances.[5]

## IV

It remains to be determined whether, in this case, the business of selling advertising space is "substantially related"— or, in the words of the regulation, "contributes importantly"— to the purposes for which respondent enjoys an exemption from federal taxation. Respondent has maintained throughout this litigation that the advertising in Annals performs an educational function supplemental to that of the journal's editorial content. App. 7a. Testimony of respondent's witnesses at trial tended to show that drug advertising performs a valuable function for doctors by disseminating information on recent developments in drug manufacture and use. *Id.*, at 27a, 38a, 43a. In addition, respondent has contended that the role played by the Food and Drug Administration, in regulating much of the form and content of prescription-drug advertisements, enhances the contribution that such advertisements make to the readers' education. All of these

---

[5] This conclusion is consistent with the Treasury's own approach to analogous problems. See, *e. g.*, Rev. Rul. 82–139, 1982–2 Cum. Bull. 108 (advertisements in county bar journal; no *per se* rule); Rev. Rul. 72–431, 1972–2 Cum. Bull. 281 (exempt organization's sale of mailing lists to commercial advertisers; no *per se* rule). Our rejection of the *per se* rule renders it unnecessary for us to address respondent's alternative argument that any such rule should apply only to associations organized under § 501(c)(6) of the Internal Revenue Code.

factors, respondent argues, distinguish the advertising in Annals from standard commercial advertising. Respondent approaches the question of substantial relation from the perspective of the journal's subscribers; it points to the benefit that they may glean from reading the advertisements and concludes that that benefit is substantial enough to satisfy the statutory test for tax exemption. The Court of Appeals took the same approach. It concluded that the advertisements performed various "essential" functions for physicians, 743 F. 2d, at 1576, and found a substantial relation based entirely upon the medically related content of the advertisements as a group.

The Government, on the other hand, looks to the conduct of the tax-exempt organization itself, inquiring whether the publishers of Annals have performed the advertising services in a manner that evinces an intention to use the advertisements for the purpose of contributing to the educational value of the journal. Also approaching the question from the vantage point of the College, the Claims Court emphasized the lack of a comprehensive presentation of the material contained in the advertisements. It commented upon the "hit-or-miss nature of the advertising," 3 Cl. Ct., at 543, n. 3, and observed that the "differences between ads plainly reflected the advertiser's marketing strategy rather than their probable importance to the reader." *Id.*, at 534. "[A]ny educational function [the advertising] may have served was incidental to its purpose of raising revenue." *Id.*, at 535.

We believe that the Claims Court was correct to concentrate its scrutiny upon the conduct of the College rather than upon the educational quality of the advertisements. For all advertisements contain some information, and if a modicum of informative content were enough to supply the important contribution necessary to achieve tax exemption for commercial advertising, it would be the rare advertisement indeed that would fail to meet the test. Yet the statutory and regulatory scheme, even if not creating a *per se* rule *against* tax

exemption, is clearly antagonistic to the concept of a *per se* rule *for* exemption for advertising revenue. Moreover, the statute provides that a tax will be imposed on "any trade or business the *conduct* of which is not substantially related," 26 U. S. C. § 513(a) (emphasis added), directing our focus to the manner in which the tax-exempt organization operates its business. The implication of the statute is confirmed by the regulations, which emphasize the "manner" of designing and selecting the advertisements. See Treas. Reg. § 1.513–1(d)(4)(iv), Example 7, 26 CFR § 1.513–1(d)(4)(iv), Example 7 (1985). Thus, the Claims Court properly directed its attention to the College's conduct of its advertising business, and it found the following pertinent facts:

> "The evidence is clear that plaintiff did not use the advertising to provide its readers a comprehensive or systematic presentation of any aspect of the goods or services publicized. Those companies willing to pay for advertising space got it; others did not. Moreover, some of the advertising was for established drugs or devices and was repeated from one month to another, undermining the suggestion that the advertising was principally designed to alert readers of recent developments [citing, as examples, ads for Valium, Insulin and Maalox]. Some ads even concerned matters that had no conceivable relationship to the College's tax-exempt purposes." 3 Cl. Ct., at 534 (footnotes omitted).

These facts find adequate support in the record. See, *e. g.*, App. 29a–30a, 59a. Considering them in light of the applicable legal standard, we are bound to conclude that the advertising in Annals does not contribute importantly to the journal's educational purposes. This is not to say that the College could not control its publication of advertisements in such a way as to reflect an intention to contribute importantly to its educational functions. By coordinating the content of the advertisements with the editorial content of the issue, or by publishing only advertisements reflecting

new developments in the pharmaceutical market, for example, perhaps the College could satisfy the stringent standards erected by Congress and the Treasury. In this case, however, we have concluded that the Court of Appeals erroneously focused exclusively upon the information that is invariably conveyed by commercial advertising, and consequently failed to give effect to the governing statute and regulations. Its judgment, accordingly, is

*Reversed.*

CHIEF JUSTICE BURGER, with whom JUSTICE POWELL joins, concurring.

Most medical journals are not comparable to magazines and newspapers published for profit. Their purpose is to assemble and disseminate to the profession relevant information bearing on patient care. The enormous expansion of medical knowledge makes it difficult for a general practitioner— or even a specialist—to keep fully current with the latest developments without such aids. In a sense these journals provide continuing education for physicians—a "correspondence course" not sponsored for profit but public health.

There is a public value in the widest possible circulation of such data, and advertising surely tends to reduce the cost of publication and hence the cost to each subscriber, thereby enhancing the prospect of wider circulation. Plainly a regulation recognizing these realities would be appropriate. Such regulations, of course, are for the Executive Branch and the Congress, not the courts. I join the opinion because it reflects a permissible reading of the present Treasury regulations.