T.C. Memo. 1996-63

UNITED STATES TAX COURT

ALUMNI ASSOCIATION OF THE UNIVERSITY OF OREGON, INC.,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No 2132-94.                    Filed February 20, 1996.

<u>Philip N. Jones</u>, <u>Carolyn W. Miller</u>, and <u>Stephen J.</u>
<u>Klarquist</u>, for petitioner.

<u>Brenda M. Fitzgerald</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioner's Federal income tax of $75,588 for 1990 and $105,183
for 1991.

The issue for decision is whether petitioner's income from an affinity credit card program is a royalty excluded by section 512(b)(2) from the tax on unrelated business income. We hold that it is.

Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioner

Petitioner, Alumni Association of the University of Oregon, Inc., is an Oregon nonprofit corporation exempt from Federal income tax under section 501(c)(3). Petitioner's principal place of business is Eugene, Oregon. Petitioner was established to advance the cause of higher education, promote the interests and increase the usefulness of the University of Oregon, and encourage good fellowship of its members to further its purposes. Petitioner fulfilled its purposes by communicating with alumni and sponsoring continuing educational activities and social events. During the years at issue, petitioner had a staff of 12 or 13 employees.

B. History of the University of Oregon Alumni Association Affinity Credit Card Program

In 1986 and 1987, petitioner became aware of affinity credit card programs through news articles and discussions with

representatives from other organizations. Petitioner received unsolicited proposals regarding the affinity credit card program from the United States National Bank of Oregon (USNB) and another financial institution. Petitioner's then executive director, Philip Super (Super), rejected both proposals.[1] Super contacted Donald Wirth (Wirth), the executive director of the Oregon State University Alumni Association (OSUAA), to discuss the affinity credit card program. Wirth and Super wanted their organizations to develop an affinity credit card program.

Petitioner and the OSUAA formed a committee to solicit proposals from several banks and to select a plan. Petitioner and the OSUAA formed the committee to increase their bargaining power and to avoid duplication of effort. The committee was headed by Wirth and Super. Its members were volunteers from both organizations. After reviewing 8 to 10 plans, the committee chose USNB's plan. After negotiations, the parties signed an Affinity Credit Card Agreement[2] (the Agreement) on June 23, 1987.

---

[1] Philip Super was petitioner's executive director when petitioner negotiated and implemented the affinity credit card program. Dan Rodriguez (Rodriguez) became petitioner's executive director starting in September 1988. Rodriguez was petitioner's executive director during the years in issue.

[2] The Agreement was amended on Apr. 9, 1987. The parties changed the word "fees" to "royalties" in par. 4 of the Agreement. Neither party contends that the amendment affects any issue in dispute.

On September 30, 1987, USNB held a press conference and issued a news release announcing the affinity credit card program. One of petitioner's representatives gave a brief speech at the press conference. Petitioner did not otherwise inform the news media of the affinity credit card program.

USNB entered into the Agreement primarily to make money. Its objectives in signing the affinity credit card agreement were to gain access to petitioner's mailing list and to obtain petitioner's endorsement. USNB believed that it would be easier to market credit cards through an affinity credit card program than to market credit cards otherwise.

Petitioner established the affinity credit card program to keep alumni aware of their ties to the University of Oregon and to keep the University of Oregon's name before the public, to provide a low-cost credit card to alumni and other University of Oregon supporters, and to provide revenue for its programs without placing undue demands on its staff.

C. The Affinity Credit Card Agreement

USNB agreed to prepare and mail, at its expense, promotional materials and credit card applications to petitioner's members. USNB also agreed: (1) To announce petitioner's activities and alumni news four times each year at USNB's expense on periodic statements mailed to alumni credit card holders; and (2) to place a full-page color advertisement in petitioner's publication at

the standard rate at least twice annually during the term of the Agreement.

Petitioner agreed: (1) To give USNB the names, addresses, and graduation dates of its members; (2) to license the use of its name, logo, and official seal of the University of Oregon to USNB; and (3) to inform its members of the affinity credit card program, at its expense, at least once per year. The Agreement did not require petitioner to mail any solicitation materials to alumni. Petitioner could prepare, at its discretion, materials containing announcements of its activities and alumni news four times annually to accompany USNB's periodic statements.

USNB agreed to pay petitioner $4 for each new account, $4.50 for renewal of a Classic Visa card, $7 for renewal of a Premier Visa card, and 1 percent of all authorized cash purchases and advances. The Agreement was for 5 years, and was automatically renewable for 1-year periods unless terminated by either party.

D. List of Alumni

USNB asked petitioner for the list of alumni about once a year. USNB was to solicit credit card applications from those members and issue a card to approved applicants.

The data base of alumni was kept on a computer owned and possessed by the University of Oregon Foundation. Petitioner forwarded USNB's requests to the University of Oregon Foundation. The University of Oregon Foundation prepared a magnetic tape for USNB's use. Employees of the University of Oregon Foundation

spent no more than 1 hour preparing the tape.  The University of Oregon Foundation processed the information and delivered the magnetic tape to petitioner at no charge.  Petitioner sent the tape to USNB.  USNB returned the tape to petitioner after using it for a particular mailing.

The University of Oregon Foundation is not owned or financed by petitioner.  The data base was not available on the open market.  Petitioner updated this list and recorded pre- and post-graduation information about each alumnus.

USNB gave petitioner a list of alumni cardholders each quarter.  Petitioner's employees spent about 2 hours each quarter entering data regarding the cardholders.

E.  Postagreement Activities by USNB

   1.  USNB Mailings to Petitioner's Members

USNB hired and paid an advertising agency and direct mail house to write, design, print, and mail solicitation materials to petitioner's members.  These mailings cost about $1.25 per item. Petitioner gave signatures of its president to USNB to duplicate on promotional materials.  An employee of petitioner spent about 1 hour reviewing the material for each mailing and occasionally suggested minor changes or made corrections.  Petitioner might suggest that USNB "tone down" the pitch of the solicitation or correct the spelling of a name.  Petitioner had no authority to finally approve USNB's materials.

   2.  USNB's Advertising in Old Oregon and The Alumni

Insider

Petitioner's primary means of communicating with its alumni is through Old Oregon and the Alumni Insider. Old Oregon is published by the University of Oregon and is not connected with or controlled by petitioner. Petitioner had no publication before 1990. USNB advertised the affinity card program in Old Oregon. Old Oregon accepted no other advertising. The record does not show whether Old Oregon charged USNB to advertise.

Petitioner began its own publication, the Alumni Insider, in 1990. The Alumni Insider was published quarterly and had a circulation of about 10,000. The Alumni Insider was mailed to petitioner's dues-paying members. The Alumni Insider published two advertisements each year about the affinity credit card program. The advertisements were designed by a professional advertising agency at USNB's request. USNB paid for the design of all advertisements published in the Alumni Insider. Petitioner did not bill USNB for the advertisements until 1991.

Petitioner charged USNB $800 per year to publish the two advertisements beginning in late 1991. The $800 charge was an estimate of petitioner's cost to produce the advertisements. Petitioner's employees do not know why USNB was not charged for the first few advertisements.

Petitioner occasionally published advertisements for the affinity credit card program in the Alumni Insider when it had space available. Petitioner used a camera-ready copy provided

by USNB for prior advertisements. Petitioner did not charge USNB for these advertisements.

USNB gave petitioner a copy of each advertisement to review and approve. It took one or two of petitioner's employees about 30 minutes to examine the advertisements. Petitioner's employees examined the advertisements for typographical errors and content.

### 3. Design of the Credit Cards

USNB designed the cards issued under the program. The Classic Visa card had a photograph of a University of Oregon building easily recognizable by University of Oregon alumni and the words "UNIVERSITY OF OREGON ALUMNI ASSOCIATION" printed on it.[3] The premier card had the same written notation as the classic card but had no photograph.

### F. Postagreement Activities by Petitioner

### 1. Petitioner's Solicitations of Alumni

The University of Oregon Printing Department printed and mailed solicitation materials three times from 1987 to 1991.[4] Two of these mailings preceded the years at issue, and one was

---

[3] Petitioner's logo is a roof of a building with the letters "U" and "O" on separate sides and the words "ALUMNI ASSOCIATION" on the bottom half of the roof. Petitioner's logo is a registered trademark.

[4] Petitioner, in its proposed findings of fact, asserts that it sent out promotional materials twice. Petitioner stipulated that it mailed promotional materials three times from 1987 to June 30, 1991. Because there is no evidence that the stipulation is wrong, we accept it as correct.

during the years at issue.  The University of Oregon Printing Department:  (a) Printed and mailed a letter and brochure supplied by USNB to 63,451 alumni in 1988; (b) printed and mailed a letter prepared and supplied by USNB to about 14,500 University of Oregon students in 1988; and (c) printed and mailed a letter and brochure supplied by USNB to 39,900 University of Oregon alumni in 1990.  USNB fully reimbursed petitioner for all costs associated with these mailings.

Petitioner was not obligated by the Agreement to print and mail these materials but did so because it cost less than the direct mail house USNB hired, USNB did not have enough in-house printing and mailing capacity, and the University of Oregon Printing Department was convenient to the parties.  Both USNB and petitioner hoped to benefit from the mailings.

Petitioner's mailings were not as sophisticated as USNB's because the cardholder's accounts were not preapproved, they did not contain some material recommended by professional marketers, they were not in full color, and they were of ordinary size. USNB received more positive responses from its mailings than it did from petitioner's mailings.  Ninety-five percent of the cardholders became cardholders because of USNB's marketing efforts.

Petitioner included information about the affinity credit card program in its membership application materials.  Petitioner published information about the affinity credit card program in

its annual report. The report went to petitioner's members. USNB did not expect or require petitioner to mail direct solicitation materials to satisfy its duty to inform members about the affinity credit card program.

### 2. Petitioner's Occasional Assistance to Alumni

After the affinity credit card program began, petitioner occasionally received requests from alumni for credit card applications. In each case, petitioner sent a brochure to the person making the request.

Petitioner received a few complaints from alumni who had been denied a credit card. Petitioner referred these complaints to USNB and asked USNB to look into the problem. USNB decided whether to issue a credit card. On each occasion, USNB told petitioner that the alumni member was contacted and the matter handled appropriately.

Petitioner occasionally received requests for credit cards from persons who were connected with the University of Oregon but who were not alumni. Petitioner forwarded each request to USNB.

### 3. USNB's 800 Number for Affinity Credit Card Holders

All advertisements and solicitations asked the recipient to contact USNB directly. The promotional materials listed USNB's 800 number. It was expected that alumni would contact USNB. Petitioner maintained a list of USNB employees and their areas of

service.  Petitioner kept this list so it could refer alumni who contacted its office to the appropriate USNB employee.

   4.  Involvement of Petitioner's Executive Director in the
       Affinity Credit Card Program

Petitioner allocated 10 percent of Super's salary to develop and implement the affinity credit card program for fiscal years 1986 and 1987 and from July to October 1987.  Petitioner allocated 5 percent of Super's salary to the affinity credit card program from November 1987 to April 1988.  Petitioner did not allocate any salary to the affinity credit card program for the years in issue (1990 and 1991).  Petitioner's executive director from September 1988 to present, Dan Rodriguez (Rodriguez), met with USNB and a representative from the OSUAA once a year to review the performance of the affinity credit card program.  These meetings lasted about 1-½ to 2 hours.  Rodriguez worked approximately 1 hour per month on the affinity credit card program.

G.  Petitioner's Travel Program

Petitioner arranged trips for its members through two travel agencies.  Petitioner earned $16,908 in fiscal year 1990 and $14,396 in fiscal year 1991 from its travel program.  These figures do not include costs for travel to bowl games.  For bowl games, petitioner incurred net losses of $15,892 for fiscal year 1990 and $7,334 for fiscal year 1991.

H.  Watches and Rings

Petitioner entered into an agreement with Wayneco Enterprises, Inc. (Wayneco). Wayneco agreed to provide class rings and commemorative watches to alumni. Wayneco paid petitioner $25 for each item purchased.

I.  Petitioner's Income From the Affinity Credit Card Program

Petitioner grossed $223,566 in 1990 and $305,296 in 1991 from the affinity credit card program.

OPINION

A.  Taxation of Unrelated Business Income

Section 511(a)(1) imposes a tax on the unrelated business taxable income (UBTI) of certain tax-exempt organizations. Petitioner is subject to tax on its unrelated business income under section 511(a)(2)(A) because it is tax exempt under section 501(c). Income is UBTI if:  (1) The income arises from a trade or business; (2) the trade or business is regularly carried on; and (3) the trade or business is not substantially related to the organization's tax-exempt purpose. Sec. 512(a)(1); Veterans of Foreign Wars v. Commissioner, 89 T.C. 7, 19-20 (1987).

B.  Royalty Income

Royalty income is excluded from UBTI. Sec. 512(b)(2). A royalty is a payment to use valuable intangible property rights. Disabled Am. Veterans v. Commissioner, 94 T.C. 60, 70 (1990), revd. on other grounds 942 F.2d 309 (6th Cir. 1991). Whether

income is a royalty is decided based on the facts and circumstances.  Sec. 1.512(b)-1, Income Tax Regs.

Respondent contends that USNB's payments are not royalties because:  (1) USNB did not pay petitioner to use a valuable intangible property right; (2) petitioner did not use its own mailing list; (3) the payments to petitioner were for services rendered by petitioner; and (4) the enactment of section 513(h) precludes royalty treatment.

1.  <u>Whether USNB Paid Petitioner To Use a Valuable Intangible Property Right</u>

Respondent contends that USNB did not pay petitioner to use valuable intangible property rights because USNB did not display petitioner's logo on the cards.  We disagree.

The classic Visa card bore a photograph of an easily recognizable building on the University of Oregon's campus and the words "UNIVERSITY OF OREGON ALUMNI ASSOCIATION".  The premier card also had those words but had no photograph.  USNB's failure to depict the building on the premier card does not show that petitioner failed to exchange a valuable intangible right.

In the Agreement, petitioner gave USNB access to valuable intangible property rights.  The Agreement gave USNB permission to use the University of Oregon seal with petitioner's logo. Petitioner's logo is a registered trademark.  Petitioner maintained all rights to the logo which it did not specifically give to USNB.  USNB could not use petitioner's name or logo after

the Agreement terminated. USNB's objectives in signing the Agreement were to gain access to petitioner's mailing list and to obtain petitioner's endorsement. Those are valuable intangible property rights. Sierra Club, Inc. v. Commissioner, 103 T.C. 307, 344 (1994). We find respondent's contention about how USNB designed the credit cards unconvincing. We conclude that petitioner's income from the affinity credit card program was received in exchange for the use of valuable intangible property rights.

2. Whether Petitioner's Use of Its Mailing List Is Inconsistent With Royalty Treatment

Respondent contends that petitioner's income from its mailing list is not a royalty because petitioner's use of its mailing list was a trade or business.

In Disabled Am. Veterans v. United States, 227 Ct. Cl. 474, 650 F.2d 1178, 1184 (1981), the Court of Claims held that the Disabled American Veterans (DAV) conducted the trade or business of renting its mailing list. From 1974 to 1979, DAV rented parts of its donor list 451 times. Disabled Am. Veterans v. Commissioner, 942 F.2d at 311. DAV continuously rented names on its list during the years in issue. Disabled Am. Veterans v. United States, 650 F.2d at 1184. In renting its donor list, DAV followed the usual practice of the direct mail industry. Id. DAV prepared rate cards showing the rates it charged to customers. Id. It was widely known among list brokers that

DAV's mailing list was available for rental.  Id. at 1185.  DAV employed two full-time employees to administer its list rentals. Disabled Am. Veterans v. Commissioner, 942 F.2d at 311.

Petitioner's mailing list rental activity is unlike DAV's rental activity.  Petitioner received income from the use of its mailing list only for:  (a) Alumni trips in 1990 and 1991; (b) alumni class rings and commemorative watches; and (c) the affinity credit card program at issue here.

Unlike DAV, petitioner did not regularly rent its mailing list.  Petitioner was not involved in the direct mail industry. Petitioner did not issue rate cards.  Petitioner used minimal staff time to administer its rentals.  Petitioner allocated 10 percent of Super's salary to develop and implement the affinity credit card program for fiscal year 1986-87 and from July 1987 to October 1987.  Petitioner allocated 5 percent of Super's salary to the affinity credit card program from November 1987 to April 1988.  The record does not indicate that petitioner allocated any salary to the affinity credit card program for the years in issue.  We conclude that petitioner's use of its mailing list is entirely consistent with classifying the resulting income as a royalty.

3.  Whether USNB's Payments Were for Services:  Extent
of Petitioner's Role

Respondent contends that USNB paid to obtain petitioner's cooperation and assistance.

a. Petitioner's Solicitation of Its Members

Respondent contends that petitioner's solicitation of its members for the credit card program precludes royalty treatment for the resulting income because petitioner mailed some solicitation materials once during the years in issue (1990 and 1991) and twice during prior years.

We disagree. Petitioner's activities were de minimis and intended to bolster petitioner's relationship with University of Oregon alumni. Petitioner agreed to inform its members of the existence of the affinity credit card program at least once per year, but was not required to mail any solicitation materials to alumni. USNB developed all marketing materials. Petitioner reviewed those materials, but USNB retained final decision-making authority. Petitioner might have asked USNB to "tone down" the solicitation materials or to correct the spelling of a name. USNB agreed to prepare and mail promotional materials. Petitioner's one mailing during the years at issue (1990 and 1991) included a letter and brochure designed by USNB. Ninety-five percent of the cardholders became cardholders due to USNB's marketing efforts. Petitioner included information about the program in its application materials. Petitioner apparently was using the credit card program in part to encourage alumni to join the Alumni Association of the University of Oregon.

In Sierra Club, Inc. v. Commissioner, 103 T.C. at 335, a provider of financial services, American Bankcard Services, Inc.

(ABS), and not the Sierra Club, was responsible for developing promotional materials. ABS submitted a proposed marketing plan which the Sierra Club reviewed. Id. at 336. ABS placed advertisements in the Sierra Club's magazine and paid for them on the same terms that applied to unrelated advertisers. Id. The Sierra Club could pay for direct mail or other solicitations. Id. at 313. If the Sierra Club did so, any royalties payable by ABS were adjusted. Id. ABS was responsible for soliciting members. Id. at 337. ABS was obligated to develop all promotional materials. If the Sierra Club paid production and mailing costs, ABS would compensate it for those costs. Id. at 312. The agreement in Sierra Club required that the Sierra Club fully cooperate with ABS by encouraging its members to acquire and use the services. Id. at 313. Petitioner's activities are substantially similar to those of the Sierra Club. Petitioner's solicitation activities were de minimis and were intended primarily to protect petitioner's relationship with its members and to keep its alumni aware of their ties to the University of Oregon.

b. Petitioner's Providing of Services To Promote the Affinity Credit Card Program

Respondent contends that petitioner's income from the credit card activity was not a royalty because petitioner assisted USNB in making solicitations, made its own solicitations, and provided personal services to cardholders and prospective cardholders. We

disagree.  Petitioner's activities were de minimis and were done to protect petitioner's goodwill with its members.

In Sierra Club, Inc. v. Commissioner, supra, ABS promised the cardholders that they would receive a rebate of the annual fee if they participated in the program for a second year.  Id. at 343.  ABS breached that agreement.  Id.  The Sierra Club helped arrange refunds to members.  Id.  We found that the Sierra Club's actions were done to protect its good name.  Id. Similarly, petitioner was acting to preserve its good name with alumni.

In Oregon State Univ. Alumni Association, Inc. v. Commissioner, T.C. Memo. 1996-34, we held that the taxpayer engaged in de minimis activity where it referred occasional requests for credit card applications or complaints about the denial of a credit card application, told about 14 alumni to contact its offices if they needed further assistance, and requested that USNB send preapproved applications to certain alumni, expedite about eight applications, and establish some credit limits above the standard.  Here, petitioner has engaged in less activity than the taxpayer in Oregon State.  We hold that USNB's payments to petitioner were not compensation for services rendered and that petitioner's activities are compatible with the treatment of those payments as royalty income.

4.   Petitioner's Financial Risks and Rewards

In deciding whether income a taxpayer receives is royalty income, we may consider the taxpayer's financial risks and rewards, including whether the taxpayer has a net profits and gross profits interest. See Sierra Club, Inc. v. Commissioner, supra at 333.

In Sierra Club, the taxpayer did not have a net profits interest in the royalty payments because its income was based on a percentage of the total charges. Id. at 333. Instead, it had a gross profits interest. A gross profits interest is the right to share in the gross profits without bearing the risk of loss. Id. Gross profits are the difference between sales and the cost of goods sold. Black's Law Dictionary 703 (6th ed. 1990).

Petitioner had a gross profits interest in the credit card program, not a net profits interest. Petitioner received a fixed percentage of all of the authorized cash purchases and advances, and a fixed amount for new accounts, regardless of whether USNB had losses from the affinity credit card program. Here, as in Sierra Club, no provision was made to periodically compute net income or loss from the credit card program. The fact that petitioner did not have a net profits interest supports petitioner's contention that its income from the program was a royalty.

5.  Petitioner's Desire To Make Money From the Affinity Credit Card Program

Respondent points out that petitioner entered into the affinity credit card agreement in part to make money. This, however, is not a basis for us to conclude that petitioner's income from the affinity credit card program was not a royalty. Nor does a desire to make money, standing alone, establish that petitioner is engaged in a trade or business. See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987) (not every income-producing endeavor is a trade or business); Whipple v. Commissioner, 373 U.S. 193, 197 (1963) (the income tax law distinguishes between a trade or business and transactions entered into for profit but not connected with a trade or business). Not all activity conducted with the expectation of gain is a trade or business for purposes of UBTI. Disabled Am. Veterans v. United States, 650 F.2d at 1185. To be engaged in a trade or business, petitioner must be involved in the activity with continuity and regularity and the primary purpose for engaging in the activity must be for profit. Commissioner v. Groetzinger, supra at 35.

6.   Whether the Enactment of Section 513(h) Prevents Treatment of USNB's Payments to Petitioner as Royalties

Respondent argues that the enactment of section 513(h) shows that Congress intended to treat income earned from mailing list rentals as income from a trade or business. Section 513(h) exempts from tax amounts earned by certain tax-exempt

organizations from the trade or business of exchanging or renting mailing lists to other tax-exempt organizations.[5]  Section 513(h) is effective for exchanges and rentals of member lists after October 22, 1986.  Respondent contends that the enactment of section 513(h) implies that renting mailing lists is generally a trade or business.  As in Sierra Club, Inc. v. Commissioner, 103 T.C. 307 (1994), respondent asks us to infer from the enactment of section 513(h) that Congress generally views gross income from the licensing of mailing lists as UBTI, unless excepted by section 513(h).  We do not draw that inference.

It is at best hazardous to infer the intent of an earlier Congress from a later one.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 114 (1989); United States v. Price, 361

---

[5] Sec. 513(h) provides:

(1) In general.--In the case of an organization which is described in section 501 and contributions to which are deductible under paragraph (2) or (3) of section 170(c), the term "unrelated trade or business" does not include--

*   *   *   *   *   *   *

(B) any trade or business which consists of--

(i) exchanging with another such organization, names and addresses of donors to (or members of) such organization, or

(ii) renting such names and addresses to another such organization.

Tax Reform Act of 1986, Pub. L. 99-514, sec. 1601(a), 100 Stat. 2085, 2766.

U.S. 304, 313 (1960).  The inference asserted by respondent is rejected in the legislative history of section 513(h).

A colloquy between Congressmen Daniel Rostenkowski (D-Ill.), Chairman of the Ways and Means Committee, and John Duncan (R-Tenn.), Ranking Republican Member of the Ways and Means Committee, occurred in the House of Representatives on the day that the conference report which included section 513(h) was passed.  Congressman Rostenkowski's comments were as follows:

> I also have discussed with Congressman Duncan the issue of whether the provision of the bill which excludes certain income from unrelated trade or business income creates any inference under present law.  We have reached a common understanding regarding the following specific issue:
>
> The question relates to section 1601 of the bill which excludes from unrelated trade or business income revenues from the use of a tax-exempt organization's mailing list by another such organization.  Section 1601 of the bill, which specifically exempts certain such revenues from the tax on unrelated business income in the future, carries no inference whatever that mailing list revenues beyond its scope or prior to its effective date should be      considered taxable to an exempt organization.

132 Cong. Rec. 26208 (Sept. 25, 1986).

We conclude that section 513(h) does not apply here.  See Sierra Club, Inc. v. Commissioner, T.C. Memo. 1993-199.

###    7.    Whether Royalty Treatment Is Consistent With the Role of the Tax on Unrelated Business Income

The unrelated business income tax (UBIT) was enacted to prevent tax-exempt organizations from unfairly using their tax-exempt status to compete with commercial businesses.  United

States v. American College of Physicians, 475 U.S. 834, 837-838
(1986). Respondent contends that petitioner's participation
in the affinity credit card program is the type of unfair
competition between tax-exempt organizations and taxable
businesses that Congress intended to subject to the UBIT. We
disagree. Petitioner's activity was de minimis. USNB was
competing with other credit card issuers, but petitioner was not.

Respondent cites United States v. American Bar Endowment,
477 U.S. 105 (1986). In American Bar Endowment, the Supreme
Court found that the taxpayer's activity created the kind of
unfair competition that led to the enactment of section 512.
Id. at 114. The American Bar Endowment (ABE) raised money by
providing group insurance policies to its members. Id. at 107.
ABE bought a group policy for its members and paid a negotiated
premium to the insurance company. Id. at 107-108. If the
insurance company's cost of providing insurance to the group was
lower than the premium, the company refunded the excess. Id.
at 108. The excess amounts were called dividends. Id. ABE
required all members to agree, as a condition of participating
in the group insurance program, that ABE and not the members
would keep the dividends. Id. ABE told its members that the
members' share of the dividends, less ABE's administrative costs,
was a tax-deductible contribution from the members to ABE. Id.

ABE actively administered the group insurance program. Id.
ABE's activities included choosing insurers, negotiating premium

rates with insurers, compiling lists of its members, soliciting and collecting premiums from its members, sending premiums to the insurer, keeping files on each policyholder, answering members' questions about insurance policies, and screening claims for benefits.  Id.  The Court held that ABE was engaged in a trade or business.  Id. at 114.

The Court found that this arrangement created unfair competition because ABE's members could deduct part of their premium payment as a charitable contribution.  This deduction lowered the cost of ABE's insurance to its members.  Id. at 114-115.  Nonexempt businesses would be disadvantaged if ABE were not taxed on its earnings from the insurance program because ABE would not need to be as profitable to receive the same return on its investment.  Id. at 115.

This case is not like American Bar Endowment.  ABE paid premiums to insurance carriers; petitioner did not make payments to USNB.  ABE required members to assign any amounts paid in excess of the cost of the insurance to ABE.  Petitioner imposed no similar obligation on its members.  ABE members could deduct excess payments assigned to ABE as charitable contributions. Petitioner's members could not deduct their payments to USNB. ABE collected premiums and screened claims for benefits. Petitioner did not bill cardholders, collect payments, or decide who was eligible to receive a credit card.

We disagree with respondent's contention that petitioner was unfairly competing with taxed businesses.

C.  Conclusion

For the foregoing reasons, we hold that petitioner's income from the affinity credit card program is a royalty for purposes of section 511.

To reflect the foregoing,

Decision will be entered
under Rule 155.