**AMERICAN HOSPITAL ASSOCIATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 84 C 2623.

United States District Court, N.D. Illinois, E.D.

Feb. 26, 1987.

George A. Platz, Gina B. Kennedy, Sidley & Austin, Chicago, Ill., for plaintiff.

Joan C. Laser, U.S. Atty., Chicago, Ill., for defendant.

MEMORANDUM

LEIGHTON, Senior District Judge.

Plaintiff has brought a claim for refund action with respect to income taxes imposed on income received from periodicals it published during the years 1973 and 1974. It alleges: (1) that its periodical income is tax-exempt;[1] (2) that the IRS misconstrued the applicable Treasury Regulation, Treas. Reg. § 1.512(a)–1(f)(4)(i) (1975); (3) that the IRS improperly classified certain publication costs as "readership costs" rather than "direct advertising costs"; (4) that the IRS improperly interpreted the fractional allocation formula of Treas. Reg. § 1.512(a)–1(f)(4)(iii), if that formula is applicable; and (5) that Treas. Reg. § 1.512(a)–1(f) is invalid because it fails to accomplish the statutory purpose of putting exempt periodical publishers on the same tax basis as nonexempt publishers. Plaintiff now moves for partial summary judgment solely with respect to the second ground enumerated above—that the IRS misconstrued Treasury Regulation 1.512(a)–1(f)(4)(i). Defendant cross-moves for partial summary judgment on the same grounds. The following are the undisputed material facts.

I

Plaintiff, the American Hospital Association ("AHA"), is a not-for-profit corporation organized under the laws of Illinois. The AHA has always been recognized by the

---

1. In view of the recent Supreme Court decision in *United States v. American College of Physicians,* —— U.S. ——, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986), plaintiff is no longer pursuing this claim.

IRS as an organization exempt from federal income tax under Sections 501(a) and 501(c)(6) of the Internal Revenue Code to the extent that its income is related to its exempt purpose.

The AHA has three categories of membership: institutional members, individual members, and associate members. During 1973 and 1974, the years in question, the AHA's membership consisted of the following:

AHA Membership and Dues Breakdown 1973

| | No. of Members | Annual Dues Per Member |
|---|---|---|
| Institutional Members | 6,700 | $1,550 |
| Individual Members | 20,300 | 25 |
| Associate Members | 300 | 600 |
| Total | 27,300 | |

AHA Membership and Dues Breakdown 1974

| | No. of Members | Annual Dues Per Member |
|---|---|---|
| Institutional Members | 6,500 | $1,689 |
| Individual Members | 21,600 | 28 |
| Associate Members | 300 | 660 |
| Total | 28,400 | |

During 1973 and 1974, the years in question, the AHA published several periodicals, the principal one being *Hospitals, Journal of the American Hospital Association* (*"Hospitals"*), which carried articles and advertising relating to the health care field. *Hospitals* was sent free of charge to all dues-paying members of the AHA, was sold to nonmembers, and was also sent free of charge to a controlled circulation group. The controlled circulation group was comprised of various persons employed in the health care industry including but not limited to hospital and nursing home administrators, purchasing agents, engineers, food service managers, chief pharmacists, and executive housekeepers. Persons in the controlled circulation group would receive the publication regardless of whether they were members of the AHA or employed by members of the AHA. The primary reason for free distribution of *Hospitals* to the controlled circulation group is to increase the periodical's attractiveness to advertisers.

During the year 1973, *Hospitals* was so distributed to approximately 27,000 AHA members; to 9,200 nonmembers who each paid $10 per year for a subscription; and to 35,800 nonmembers who receive *Hospitals* free of charge as part of the controlled circulation group. In 1974, *Hospitals* was distributed to about 28,300 AHA members; to 9,600 nonmembers who each paid $10 per year (prior to July 1) or $15 per year (after July 1) for a subscription, and to 36,900 nonmembers who received *Hospitals* free of charge as part of the controlled circulation group. During 1973 and 1974, the subscription prices of commercial publications competitive with *Hospitals* ranged between $12 and $20.

In 1973, the AHA received total advertising revenues from *Hospitals* of $1,755,830, and actual subscription revenues of $95,093. In 1974, the AHA received $1,770,425 in total advertising revenues from *Hospitals* and $103,184 in actual subscription revenues. The cost of publishing *Hospitals* for 1973 was $1,355,669 for the production and distribution of the advertising content, and $1,037,132 for the production and distribution of the readership content. In 1974, the cost of publishing *Hospitals* was $1,494,713 for advertising content costs and $1,173,009 for readership content costs.

The AHA filed federal income tax returns for the years 1973 and 1974 showing no tax due. Subsequently, the IRS asserted that taxes were due from the AHA in the amount of $181,037 for 1973 and $141,248 for 1974. On August 13, 1980, the AHA paid these amounts, and on November 14, 1980, the AHA paid $137,948 in interest on these amounts. On August 12, 1982, the AHA filed refund claims with the IRS with respect to these payments. The IRS informed the AHA that it proposed to disallow in full the refund claim. This suit followed.

II

Even though the AHA is a tax-exempt organization under Sections 501(a) and 501(c)(6) of the Internal Revenue Code, it is

clear that its advertising income is taxable as unrelated business income. *See United States v. American College of Physicians,* — U.S. —, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986). Advertising income is calculated by taking the organization's advertising revenues and deducting from them any direct advertising costs—those costs related to the production and distribution of the advertising content. Advertising income may be further reduced by the costs associated with readership content to the extent that these readership costs exceed circulation income. Treas. Reg. § 1.512(a)–1(f)(2). Circulation income includes amounts actually received from the sale of the periodical as well as a portion of dues paid by members who receive the periodical as an incidence of membership.

The AHA's motion for summary judgment is based on its claim that the IRS incorrectly construed the applicable treasury regulation in determining its imputed circulation income. Treas. Reg. § 1.512(a)–1(f)(4)(i). Determination of the proper method of allocating members' dues to circulation income, or more specifically, defining the word "circulation" as it is used in Treasury Regulation 1.512(a)–1(f)(4)(i), lies at the heart of this controversy.

Treasury Regulation 1.512(a)–1(f)(4) specifies three different methods by which the imputed circulation income may be calculated. The structure of the regulation does not afford the taxpayer a choice as to which method he would like to employ. Rather, regulation §§ 1.512(a)–1(f)(4)(i) through (iii) are set up in a hierarchical fashion; the result being that if section (i) is inapplicable then section (ii) is to be applied and if both are inapplicable then section (iii) applies. The AHA contends that the first of the three methods listed in the regulation is the one that is applicable:

If 20 percent or more of the total circulation of a periodical consist of sales to nonmembers, the subscription price charged to such nonmembers shall determine the price of the periodical for purposes of allocating membership receipts to the periodical. Treas. Reg. § 1.512(a)–1(f)(4)(i).

The IRS, on the other hand, believes that the AHA has not met the 20 percent test set out in this subdivision. The IRS, therefore, reasons that section (i) is inapplicable and membership dues should be allocated on the percentage of periodical expenses in relation to total organization expenses. Treas. Reg. § 1.512(a)–1(f)(4)(iii).

The impact on the AHA's circulation income will deviate greatly depending on how the term "circulation" in subdivision (f)(4)(i) is construed. If free distributions to nonmembers are not included in determining whether 20 percent of the total circulation consists of sales to nonmembers, then the AHA would satisfy this test (i.e., 9,200 out of 36,200 in 1973; 9,600 out of 37,900 in 1974). The subscription price to the 9,000–plus nonmembers would be imputed to the dues-paying members in order to calculate circulation income. In 1973, this would be $10 per member; in 1974, it would be $10 per member until July of that year, at which time the subscription price was raised to $15. This imputed price is roughly equivalent to the price charged by profit-oriented publications competing with *Hospitals.*

If, as the IRS contends, "total circulation" is to include free distributions to nonmembers, then the AHA would fail the 20 percent test contained in subdivision (f)(4)(i) (i.e., 9,200 out of 72,000 in 1973; 9,600 out of 74,800 in 1974.) Following defendant's reasoning, the computation of circulation income would be based on the allocation under subdivision (f)(4)(iii) which applies the percentage of publication costs to the organization's overall costs to the amount of dues collected. This would result in the allocation of more than $50 per member for each year—approximately double the dues paid by the majority of AHA members.

Unfortunately, the definition of "circulation" as used in subdivision (f)(4)(i) is far from straightforward. A literal reading of subdivision (f)(4)(i) does not shed any light on whether the term "circulation" entails total distribution or whether it only applies to paid circulation. In the absence of a

well-settled definition of "circulation," it is appropriate to look beyond the language of the regulation to its purpose in determining its meaning. *See e.g., Hellmich v. Hellman,* 276 U..S. 233, 237, 48 S.Ct. 244, 245, 72 L.Ed. 544 (1928).

Broadly speaking, the general purpose behind taxing unrelated business income of tax-exempt organizations is to "fulfill the congressional purposes of placing private enterprise on an equal level with competing businesses run by tax-exempt institutions" without placing the tax-exempt institutions "at a competitive disadvantage." *Rensselaer Polytechnic Inst. v. Commissioner,* 732 F.2d 1058, 1062 (2d Cir.1984). More specifically, the purpose of subdivision (f)(4)(i) is to permit use of the subscription price to nonmembers as the measure for allocating dues to "circulation income" where there is assurance that the subscription price is a fair measure of the value of the publication, rather than a figure fixed at an artificially low level in an attempt to avoid tax. Treas. Reg. § 1.512(a)–1(f)(3)(iii) states:

> Allowable membership receipts is the amount which would have been charged and paid if—
>
> (a) The periodical was that of a taxable organization.
>
> (b) The periodical was published for profit, and
>
> (c) The member was an unrelated party dealing with the taxable organization at arm's length.

See [Treas. Reg. 1.512(a)–(f)(4) ] for a discussion of the factors to be considered in determining allocable membership receipts of an exempt organization periodical under the standard described in the preceding sentence.

The term "circulation" as contained in subdivision (f)(4)(i) must be construed in light of these standards. In order to do this, the court must look at the alternative allocation methods contained in Treasury Regulation Section 1.512(a)–1(f)(4)(i) through (iii) as a whole.

Because the allocation of membership dues to circulation income is somewhat arti-ficial, a reasonably objective method for making this allocation would be preferred. This is the rationale behind the structure of the Treasury Regulations contained in section 1.512(a)–1(f)(4). Ideally, the subscription price paid by nonmembers will be a suitable guide to the fair value of the publication. Treas. Reg. § 1.512(a)–1(f)(4)(i). Alternatively, where there are different membership fees for subscribing and non-subscribing members, those fees may also furnish a reasonably objective guide. Treas. Reg. § 1.512(a)–1(f)(4)(ii).

It is only when these reasonably objective methods appear untrustworthy (i.e., when the 20 percent test is failed), that the IRS should, as a last resort, use the pro rata allocation method contained in subdivision (f)(4)(iii). The pro rata allocation method is less favored since it is predicated on an assumption by the IRS as to how the membership dues should be allocated to the expenses relating to the tax-free organization's exempt activities. As the language of subdivision (f)(4)(iii) suggests, the assumption that membership receipts and gross advertising income are equally available for all the exempt activities, while generally true, is by no means valid in every circumstance. Thus, the more objective tests contained in (i) and (ii) are preferable if they can be met since they value the periodical in terms of what subscribers actually pay for it, and therefore more clearly treat the tax-free organization as if it were a taxable entity.

Keeping in mind the preference for a reasonable, objective market indicator of the fair value of a subscription, the facts in the present case suggest that nonpaying nonmembers should not be included in determining whether the tax-exempt organization has met the 20 percent test. Several factors indicate that the subscription price truly reflects what an unrelated party would have paid the AHA in an arm's length transaction. First, there is a significant ratio of paid nonmember subscriptions to member subscriptions (i.e., approximately 34 percent). Second, in absolute terms, there is a fairly large number of paying

nonmembers (i.e., 9,400 average). Lastly, during the years 1973 and 1974, other commercial publications similar to *Hospitals* were sold at a comparable price. These factors taken as a whole assure the court that the AHA has not manipulated the subscription price of its publication in an attempt to avoid unrelated business income tax.

Therefore, the court concludes that the subscription price charged by the AHA comports with the standards set out in subdivision (f)(3)(iii), in that it reflects the value that an unrelated party would pay for the publication in an arm's length transaction with a taxable organization publishing the periodical for a profit. Accordingly, for purposes of this case, the term "circulation" in Treas. Reg. § 1.512(a)–1(f)(4)(i) should be construed as applying only to paid circulation, and free distributions of the publication should be excluded in determining whether the organization has met the 20 percent test. Given the court's determination of the scope of the word "circulation," the subscription price paid by nonmembers is the value which should be used to determine the AHA's allocable membership receipts with respect to *Hospitals*.

The IRS' construction of subdivision (f)(4)(i) is not only inconsistent with the purpose of the subdivision in light of Section 512 of the Internal Revenue Code, but also contradicts the IRS' prior application of the same subdivision to other taxpayers. In Technical Advice Memorandum No. 8403013, the IRS recently stated that "free copies of [a periodical published by a tax-exempt organization] are not included in determining total circulation or the number of nonmembers sales under Reg. 1.512(a)–1(f)(4)(i)." Although this Technical Advice Memorandum has no precedential value against the IRS, it casts doubt on the propriety of the IRS' position in this case.

Based on these considerations, the court concludes that for purposes of Treas. Reg. § 1.512(a)–1(f)(4)(i) the term "total circulation" cannot be read to include those issues distributed free of charge to nonmembers. The AHA, therefore, is deemed to have

passed the 20 percent test contained in subdivision (f)(4)(i) and the imputed circulation income should be calculated based on the subscription price paid by nonmembers. Accordingly, plaintiff's motion for summary judgment on its claim that Treas. Reg. § 1.512(a)–1(f)(4)(i) should have been applied in calculating circulation income is granted; defendant's cross-motion for summary judgment is denied.

So ordered.