**NORTH CAROLINA CITIZENS FOR BUSINESS AND INDUSTRY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 617–84 T.

United States Claims Court.

Aug. 28, 1989.

---

Curtis A. Twiddy, Raleigh, N.C., for plaintiff.

David Gustafson, Washington, D.C., with whom was Asst. Atty. Gen. Shirley D. Peterson, for defendant.

## OPINION

RADER, Judge.

In this tax case, plaintiff, North Carolina Citizens for Business and Industry (the Association) seeks a refund of $4,941.80 for the year 1979. Although exempt from taxes on its educational and promotional activities, the Association must pay taxes on income from business activities unrelated to its exempt activities. Internal Revenue Code (IRC), 26 U.S.C. § 511 (1954). The Association's monthly magazine, "We the People of North Carolina," generates unrelated business income. If not offset by deductions, the advertising revenue from the magazine is taxable.

When computing the net taxable income from the magazine, plaintiff may offset certain publishing costs against advertising gains. Plaintiff, however, may deduct only the excess of these costs over the periodical's circulation income. Circulation income is determined by a formula depending upon whether 20% or more of the publication's circulation consists of sales to nonmembers. According to the formula, a taxpayer whose sales to nonmembers exceed 20% of total circulation may substantially reduce its unrelated business income. A taxpayer whose sales to nonmembers are less than 20% of total circulation receives more limited deductions against unrelated business income. Therefore, the definition of "total circulation" in the Treasury Regulations is critical to the computation of unrelated business taxes on tax-exempt publications.

In this case, members of the Association receive a copy of the magazine upon payment of their membership dues. In addition, members may designate other individuals to receive a complimentary copy of the publication for every $50.00 paid in dues.

Plaintiff contends that the term "total circulation" in the Treasury Regulations should be interpreted to exclude those readers who receive complimentary copies. Alternatively, plaintiff argues that the regulations should be declared invalid as inconsistent with the IRC. Defendant, on the other hand, contends that all readers, as opposed to only paying subscribers, should be counted within the legal meaning of the term "total circulation."

This issue is currently before this court on cross motions for summary judgment. This case was assigned to this court on October 18, 1988. After argument, this court grants defendant's motion.

## FACTS

Founded in 1942, the Association is a voluntary, statewide organization with members representing every major business, industrial, and professional interest in the state of North Carolina. The Association serves as the governmental relations "voice of business and industry in North Carolina...." Joint Exhibits, filed April 28, 1988, (Jt. Ex.) at 13. In this capacity the Association both represents its members before "state and federal government agencies" and "keeps members informed" of legislative and regulatory proposals. *Id.* Thus, the Association qualified for a tax exemption under 26 U.S.C. § 501(c)(4) (1982).

Since 1943, the Association has published a monthly magazine which reports on political, business, economic, governmental, and cultural affairs of the state. Each of the

Association's members receives the magazine upon payment of dues. In 1979, annual membership dues ranged from $150.00 to $4,000.00, depending on the number of employees of the member. For every $50.00 in dues paid in 1979, a member was entitled to receive one subscription to the magazine. Thus, the number of copies purchased by each member was determined by the amount of dues. The member then designated a person or institution to receive, without further charge, the copy of the publication purchased by dues. The Association called all such designees "qualified recipients," added their names to the magazine's mailing list, and reported them as "legitimate subscribers" under the postal regulations. The Association included "qualified recipients" as subscribers when describing the magazine's circulation in letters to potential advertisers. Jt. Ex. at 77–96.

During 1979, the Association had 1,230 dues-paying members. In the same year, the Association sent out 8,157 copies of the magazine each month to members and their designated recipients. The Association also sold annual subscriptions for $10.30. In 1979, 588 nonmembers received periodicals by paying the market subscription price. Joint Stipulation of Facts, filed Apr. 28, 1988, (Jt. Stip.) ¶ 17. Schools, libraries, and individuals desiring one issue (members and nonmembers alike) could purchase a single copy at a reduced rate. Thus, approximately 1,088 copies of the Association's magazine were mailed to nonmember paid subscribers per month in 1979. Jt. Stip. ¶ 19.

To cover some of the cost of producing the magazine, the Association sold advertising space. As measured by column inches, the paid advertising constituted 41.69% of the magazine in 1979. The magazine's gross advertising revenues were $170,262.00, which accounted for just over 59% of the total cost of publication.

Plaintiff filed a tax return which reported on its magazine's advertising finances, which qualified as "unrelated business income." 26 U.S.C. §§ 511–13. In preparing its return, the Association followed guidelines contained in the Treasury Regulations (Treas.Reg.), 26 C.F.R. § 1.512(a)–1(f). Thus, plaintiff computed its "advertising gain" and then subtracted excess "readership costs." The net gain was taxable income.

First, the Association computed its "advertising gain." Plaintiff reported gross advertising revenues of $170,262.00. From this gross figure, plaintiff appropriately deducted "direct advertising costs" of $119,099.00. To obtain these "direct advertising costs," plaintiff multiplied the total production cost of the magazine ($285,677.00) by 41.69%, the portion of the magazine dedicated to advertising.[1] After deducting "direct advertising costs" from gross advertising revenues, plaintiff derived an "advertising gain" of $51,163.00. Defendant does not contest this computation.

Plaintiff's next step in computing its "unrelated business income" derived from advertising was to deduct *excess* "readership costs" from the "advertising gain." Plaintiff may deduct "readership costs" from the "advertising gain" only to the extent those costs exceed the magazine's circulation income. Thus, the regulations require computations to ascertain if the costs of the nonadvertising portion of the magazine (the "readership costs") exceed the revenues derived from those non-advertising portions (the "circulation income").

Plaintiff computed its 1979 readership costs by subtracting from the magazine's total expenses ($285,677.00) that 41.69% portion attributable to "direct advertising costs" ($119,099.00). The Association's "readership costs" amounted to $169,579.00. Defendant does not contest this computation of "readership costs."

Next, plaintiff computed "circulation income," a necessary prerequisite to deriving

---

1. Defendant notes that this computation allows plaintiff to include in "direct advertising costs" a portion of overhead costs and other costs attributable to publication of the entire magazine, rather than merely publication of the advertising portions of the magazine. In other words, the Treasury Regulations permit a taxpayer, when computing "advertising gain," to deduct the advertising portion of each magazine publication expense.

*excess* "readership costs." "Circulation income" consists of both direct sales (mostly sales to nonmember subscribers) and sales as a portion of membership dues. Direct sales for plaintiff in 1979 amounted to $13,549.00. Defendant does not dispute the direct sales component of plaintiff's "circulation income." Sales, as a portion of membership dues however, has sparked this lawsuit.

Treasury Regulations dictate the procedure for figuring the portion of membership dues allocable to the price of the magazine:

> If 20 percent or more of the *total circulation* of a periodical consist of sales to non-members, the subscription price charged to such nonmembers shall determine the price of the periodical for purposes of allocating membership receipts to the periodical.

Treas.Reg. § 1.512(a)–1(f)(4)(i) (emphasis added). If less than 20% of the magazine's total circulation consists of sales to nonmembers, the regulations allocate membership dues to circulation income based on a pro rata formula. Treas.Reg. § 1.512(a)–1(f)(4)(iii). The pro rata allocation method states:

> [T]he share of membership receipts allocated to the periodical ... shall be an amount equal to the organization's membership receipts multiplied by a fraction the numerator of which is the total periodical costs and the denominator of

which is such costs plus the cost of other exempt activities of the organization.

*Id.*

Plaintiff contends that more than 20% of the magazine's total circulation consisted of sales to nonmembers. Plaintiff, therefore, claimed that the direct sales price of the magazine represented the portion of membership dues allocable to circulation income. To derive a dollar figure, plaintiff first divided its total membership dues ($296,585.00) by $50.00, the amount which entitled a member to additional copies of the magazine. This computation showed that members were entitled to receive 5,932 copies of the magazine.[2] Plaintiff next multiplied this figure by the subscription price of the magazine to a nonmember, $10.00, to obtain a total of $59,320.00. On its tax return, plaintiff claimed $59,320.00 as its allocable membership receipts.

Finally, by adding these allocable membership receipts of $59,320.00 to nonmember sales of $13,549.00, plaintiff derived an amount of $72,869.00 for total circulation income. This figure, in turn, plaintiff subtracted from "readership costs" to arrive at excess "readership costs" of $93,709.00. This cost more than entirely offset plaintiff's "advertising gain." The Association thus filed a Form 990–T (Exempt Organization Business Income Tax Return) for 1979, which reported a net advertising loss of $42,546.00 and no tax liability.

Plaintiff's computations appear in the following table:

| | | |
|---|---|---|
| Gross advertising income | | $170,262 |
| Direct advertising costs | | 119,099 |
| Net Advertising gain or (loss) | | $51,163 |
| Members subscription income | $ 59,320 | |
| Sales to nonmembers | $ 13,549 | |
| Total circulation income | $ 72,869 | |
| Readership costs | $166,578 | |
| Excess readership costs (total circulation income less readership costs) | | ($93,709) |
| Net advertising loss | | ($42,546) |

**2.** The parties agree that 8,157 magazines were actually mailed monthly to recipients upon payment by members of their dues. The lower figure of 5,932 which appears in plaintiff's tax computations is apparently based on plaintiff's failure to account for some members who were entitled to receive a copy of the magazine for every $25.00 of dues paid.

Upon examination of plaintiff's 1976–1979 tax returns, the Internal Revenue Service (IRS or Service) disputed the Association's computation of "allocable membership receipts" as $59,320.00. The Service asserted that less than 20% of the magazine's total circulation consisted of sales to nonmembers. Therefore, the Service used the pro rata allocation method to recalculate plaintiff's "allocable membership receipts." Rather than $72,869.00, IRS computed plaintiff's circulation income as $144,874.00.

This greater income figure offset more of plaintiff's readership costs. According to the IRS, plaintiff's excess readership costs were $21,704.00, rather than $93,-709.00. Instead of a loss, plaintiff's net advertising income was $29,459.00. Based on this taxable income, the Service assessed plaintiff for $4,941.80, along with added interest of $2,876.26. On April 19, 1984, plaintiff paid the tax deficiency.

In the present lawsuit, plaintiff contends that the Treasury Regulation term "total circulation" should exclude multiple copies purchased automatically by members as part of their dues. Otherwise, plaintiff contends, the regulation is fatally inconsistent with the language and purpose of the IRC. Finally, plaintiff argues that IRS's promulgation of its regulations violated the procedures of the Administrative Procedures Act, 5 U.S.C. § 553(b), (APA) and internal Treasury Department procedures.

Defendant argues that "total circulation" means the actual number of magazine copies distributed without regard to how the copies were purchased. Defendant contends also that the regulation is a reasonable interpretation of the IRC. Finally, defendant asserts that this court lacks jurisdiction to decide plaintiff's APA and Internal Revenue Manual (IRM) arguments.

This court, therefore, must decide the meaning of "total circulation" within the Treasury Regulations. In addition, this court must ascertain if the applicable regulations reasonably interpret the language and purpose of the IRC. Finally, this court must determine its jurisdiction to entertain plaintiff's APA and IRM contentions.

## DISCUSSION

Pursuant to RUSCC 56 the parties cross-move for summary judgment. Both parties claim that they are entitled to judgment as a matter of law. The parties have filed joint stipulations and assert the absence of any genuine issue of material fact. The rules of this court are designed "to secure the just, speedy, and inexpensive determination of every action." RUSCC 1(a)(1); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, summary judgment, an integral part of the court's rules, enables this court to resolve cases as a matter of law. RUSCC 56; *Diebold Inc., v. United States,* 16 Cl.Ct. 193, 197 (1989).

The United States Court of Appeals for the Federal Circuit stated: "[S]ummary judgment may no longer be regarded as a disfavored procedural shortcut." *Sweats Fashions v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). Only disputes over material facts that might affect the outcome of a suit preclude this court from making a decision based on summary judgment motions. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). No material facts remain in controversy. Thus, this court may resolve the case at bar as a matter of law.

### *Total Circulation*

The IRC § 511 taxes exempt organizations on business income unrelated to their exempt functions. Section 512 defines "unrelated business taxable income:"

[T]he term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business ... less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business....

26 U.S.C. § 512(a)(1). Section 513 of the IRC further clarifies that paid advertising in an exempt organization's publication qualifies as unrelated business income. Thus, § 512 requires the Association to pay tax on its gross advertising income as reduced by those deductions "which are directly connected" with advertising.

The IRS has promulgated regulations to clarify further what deductions are sufficiently connected to advertising to qualify as offsets to advertising income. The regulations specify that two kinds of costs qualify: direct advertising costs and excess readership costs.

The first category of qualifying deductions is "direct advertising costs." This category represents that portion of the total expenses of producing the magazine attributable to advertising. In this case, paid advertising comprised 41.69% of the magazine. Therefore, "direct advertising costs" were 41.69% of the total cost of producing the publication. This first category of deductions is not at issue in this case.

A taxpayer might justifiably argue, however, that a magazine's feature articles must attract readers in order to make the advertising effective. Therefore, some portion of the cost of producing the rest of the magazine ought to qualify as a reduction on advertising income. The regulation takes this concern into account in the second category of deductions. The regulation permits deduction of *excess* "readership costs." Readership costs cover the expense of producing the non-advertising portion of the publication. A taxpayer may deduct these expenses, however, only to the extent that they exceed "circulation income" (the revenues derived from the non-advertising portions of the magazine). The issue in this case is how to appropriately calculate "circulation income."

"Circulation income" comes from two sources: (1) sales on the open market at the magazine's cover price or subscription price, and (2) "sales" to members who pay some portion of their membership dues to get the magazine. Open market sales present no legal issues. The IRS and the taxpayer can both readily ascertain the revenues from sales to nonmembers at a pre-set price. The problem is deciding what portion of membership dues are actually the price of the publication.

Some portion of those dues pays for the magazine and the rest supports the other functions of the exempt organization. The Treasury Regulations strive to allocate fairly the dues between the magazine and those other exempt functions. Under some circumstances, the regulations recognize that the subscription price to nonmembers accurately reflects the portion of membership dues paid to receive the magazine.

If, however, a magazine sells very few copies to nonmembers, then the bulk of its circulation income comes from member dues. In that instance, the apparent subscription price may not reflect the actual price of the publication. Instead, membership dues might in fact be subsidizing the publication and keeping the subscription price artificially low. A district court recently went one step further and recognized that an organization could keep the subscription price "at an artificially low level in an attempt to avoid tax." *American Hospital Association v. United States*, 654 F.Supp. 1152, 1155 (N.D.Ill. 1987).

In instances where a publication has few sales to nonmembers the Treasury Regulations do not accept the subscription price as a fair measure of the value of the magazine. Rather, in those cases, the regulations use a formula to allocate a larger share of the membership dues to the organization's "circulation income."

■ The regulations employ a strict 20% test to determine whether the subscription price is an accurate reflection of that portion of membership dues allocable to the cost of the magazine. The regulation states:

> If 20 percent or more of the *total circulation* of a periodical consists of sales to nonmembers, the subscription price charge to such nonmembers shall determine the price of the periodical for purposes of allocating membership receipts to the periodical.

Treas.Reg. § 1.512(a)–1(f)(4)(i) (emphasis added). If an organization sells 20% or more of its publication's total circulation to nonmembers, the subscription price becomes the share of the dues used to calculate "circulation income." If an organization sells less than 20% of its publication's total circulation to nonmembers, then a larger share of dues becomes part of "circulation income" according to a regulatory formula. The key to this cut-off is the definition of "total circulation."

Both plaintiff and defendant purport to rely on a strict reading of the term "total circulation" within the regulation. Plaintiff argues that "total circulation" should include only those customers actually paying for a magazine. Excluding from "total circulation" readers who do not themselves pay for their copy,[3] plaintiff contends that more than 20% of the North Carolina magazine's total circulation consists of sales to nonmembers. Defendant argues that "total circulation" should include all distributed copies of the magazine. Including in "total circulation" multiple copies purchased by members and sent to nonmember readers, defendant argues that the Association's magazine does not meet the 20% test.

This court resolves this dispute by examining the language and purpose of the regulation. The regulation uses the words "total circulation." "Total circulation" is an inclusive, rather than an exclusive, term. The modifier "total" emphasizes that the regulation encompasses the entire or complete circulation, rather than some subset or portion of the entire circulation. The non "circulation" encompasses the extent of a magazine's dissemination or distribution. Together the terms "total" and "circulation" suggest coverage of the entire extent of the periodical's dissemination. Thus, plaintiff's attempt to exclude 6,927 out of 8,157 paid subscriptions from the term "total circulation" runs counter to the regulation's language.

The regulation sets forth a test for ascertaining when sales to nonmembers represent enough of total sales to make the subscription price a reliable measure of the periodical's actual market value. Thus, the 20% cut-off attempts to account for the possibility that a publication's subscription price might be subsidized by membership dues. An organization might have several reasons for keeping its periodical's subscription price artificially low—including solicitation of new members with inexpensive magazines or distribution of public service copies of the periodical or emphasis within the organization on "getting the message out" at all costs or even avoidance of taxes on unrelated business income. When a significant portion of a periodical's income, however, comes from arm's-length sales, the subscription price is more likely to be a reliable measure of the actual, unsubsidized, market value of the publication. Thus, the regulation includes a test to determine when that portion of total sales attributable to nonmembers is large enough to show that the subscription price reflects actual value.

In this context, "total circulation" takes on an economic purpose. "Total circulation" must include at least "total sales" in order for the regulation to fulfill its purpose. Excluding a significant portion of purchased copies from "total circulation" would skew the economic determination of the magazine's actual market value. Purchased copies, whether purchased at arm's length by nonmembers or purchased by members who pay incrementally higher membership fees, must be counted as part of "total circulation" to determine whether an organization might be subsidizing the cost of the periodical with member's dues. Thus, plaintiff's attempt to exclude 6,927 subscriptions purchased with incrementally higher membership dues runs counter to the purpose of the regulation.

---

**3.** These are not "free" copies because someone, namely the members, pay for each of these copies. For each additional $50 of membership dues, the member receives an additional magazine. The member then designates a non-paying non-member to receive the paid subscription. These readers, however, do not pay for their copy of the magazine. This distinction is important in relation to the *American Hospital Ass'n v. United States*, 654 F.Supp. 1152 (N.D.Ill. 1987) case. In *American Hospital*, the district court excluded from "total circulation" free periodicals or periodicals for which no one paid either dues or a subscription price.

In sum, both the language and purpose of the regulation show that "total circulation" must include at least "total sales." For the regulation to serve its purpose, "total circulation" must include the significant portion of the Association's sales to members as a portion of their dues. Otherwise, the regulation will not accurately gauge whether the Association is keeping the subscription price artificially low by subsidizing the magazine's costs with membership dues. "Total circulation" must include magazines purchased with additional dues. To exclude these paid subscriptions could result in the type of abuse the regulations were designed to prevent.

Plaintiff nonetheless seeks to exclude the 6,927 paid subscriptions from the inclusive term "total circulation." Plaintiff cites the *American Hospital* case for the proposition that "circulation" has no settled definition. Plaintiff's Brief (Pl.Br.), filed Aug. 18, 1988, at 2. For instance, according to plaintiff, the Audit Bureau of Circulation within the publishing industry defines "circulation" to exclude copies a reader receives for free.

This alternative definition suggested by plaintiff may serve the publishing industry well, but does not serve at all the purpose of the Treasury Regulations. The publishing industry places a premium on reader motivations. A reader with great enthusiasm for the content of a periodical is likely to read avidly every article and pay close attention to the publication's advertising. Thus, the publishing industry has good reason to count within circulation only those readers who purchase their own copy of a magazine. Readers who seek out and pay themselves for a periodical are most likely to fit the profile of an avid fan of the magazine's content.

Plaintiff's proposed alternative definition, however, does not provide an accurate gauge of the periodical's actual market price. Plaintiff's definition overlooks that an organization could use membership dues to subsidize the subscription price of a periodical. Plaintiff's definition excludes 6,927 subscriptions purchased by members with dues and sent to readers who did not personally pay for the magazine. The Audit Bureau of Circulation might discount these gift subscriptions as unlikely to fall in the hands of avid readers. The regulation, however, cannot overlook thousands of subscriptions purchased with additional increments of membership dues as a possible indication of subsidy. Thus, plaintiff's proposed alternative definition does not satisfy the purpose of the Treasury Regulation.

Plaintiff argues for the consideration of three other factors in determining "total circulation." These factors include a significant ratio of paid nonmember subscriptions to member subscriptions, a fairly large number of paying nonmembers, and similar commercial publications sold at comparable prices. The district court in *American Hospital* set forth these factors. 654 F.Supp. at 1155–56.[4]

Nonetheless, the Association's magazine still does not satisfy the three factors of *American Hospital.* The first factor—a significant ratio of paid nonmember to membership dues subscriptions—was 34% in *American Hospital.* In the case at bar, plaintiff has 1,088 paid nonmember subscriptions and 8,157 member subscriptions (Jt.Stip. ¶ 15, 19), resulting in a ratio of approximately 13% which is not significant by *American Hospital's* standards.[5]

The second *American Hospital* factor requires a fairly large number of paying nonmembers. The Association's 1,088 nonmember subscriptions are not a fairly large

---

**4.** The district court in *American Hospital* did not try to show that the American Hospital Association's sales to nonmembers was large enough to make its subscription price a reliable measure of actual market value. Rather, the district court excluded a class of free, unpaid distribution from "total circulation." The district court then used the three factors to show that this exclusion did not damage the reliability of the subscription price.

**5.** Plaintiff argues that its ratio, calculated by excluding 6,927 subscriptions purchased with member dues, is 32%. In *American Hospital,* the district court included all paid member subscriptions within the ratio. Plaintiff cannot rely on *American Hospital* to exclude all but 1,230 of its member subscriptions from the ratio of nonmember to member-paid subscriptions.

number in absolute terms. In *American Hospital,* the American Hospital Association had 9,400 paying nonmembers—more than eight times the number of plaintiff's paying nonmembers.

The final *American Hospital* factor, other similar commercial publications sold at a comparable price, likewise is not satisfied. Plaintiff admits there is no comparable publication. Pl.Br. at 5, Transcript of Proceedings, filed Mar. 8, 1989, at 6.[6]

Finally, this court notes that the court in *American Hospital* held:

> Accordingly, *for purposes of this case, the term "circulation"* in Treas.Reg. § 1.512(a)–1(f)(4)(i) should be construed as applying only to *paid circulation,* and free distributions of the publication should be excluded in determining whether the organization has met the 20 percent test.

*American Hospital,* 654 F.Supp. at 1156 (emphasis added). The district court in *American Hospital* included all paid circulation within the term "total circulation." Plaintiff, however, attempts to exclude a vast percentage of paid subscriptions from "total circulation." Therefore, the *American Hospital* holding does not apply to these facts because plaintiff seeks to exclude paid circulation.[7]

This court's inclusive definition of "total circulation" also finds some support from actions of plaintiff. On October 4, 1979, plaintiff reported to the Postal Service a "total paid circulation" of 9,342 subscriptions. Jt.Stip. ¶ 27. Thus, the Association included all subscriptions purchased with membership dues when reporting to the Postal Service. Moreover, in letters to potential advertisers, the Association listed its circulation as 10,000—a number encompassing all paid member subscriptions. Jt.Ex. at 77, 79, 80. Admittedly, postal regulations and advertising solicitations have a different purpose than tax regulations. These actions by plaintiff merely indicate that the Association often used the term "circulation" in broad inclusive terms, rather than the exclusive definition it now proposes.

Regardless of these additional indications of the soundness of an inclusive reading of "total circulation," the language and purpose of the Treasury Regulations require plaintiff to count at least all paid subscriptions within "total circulation." Thus, plaintiff had in 1979 a total monthly circulation of approximately 9,245 (8,157 paid member subscriptions and 1,088 paid nonmember subscriptions).[8] This yields an 11.7% figure for sales to nonmembers—well below the 20% cutoff.

Thus, the subscription price charged by the Association is not a credible measure of the magazine's value in an arm's-length transaction. Even under the factors set forth in *American Hospital,* plaintiff's subscription price lacks reliability. Plaintiff does not satisfy the 20% test based on "total circulation" as set forth in the regulations.

Because the subscription price charged by the Association fails to satisfy the standards set forth in subdivision § 1.512(a)–1(f)(3), that price does not reflect the amount that an unrelated party would pay for the magazine in an arm's length transaction. Instead plaintiff must calculate its taxes by resort to the regulatory formula in Treas.Reg. § 1.512(a)–1(f)(4)(iii), which allocated a larger share of membership dues to circulation income.

### Reasonableness of Treasury Regulations

■ Plaintiff contends Treas.Reg. § 1.512(a)–1 is "patently inconsistent with the statutory purpose of equalizing the tax treatment of exempt and nonexempt orga-

---

**6.** A magazine similar "in all material respects" to plaintiff's publication sold for $15.00 in 1981, rather than the $10.30 charged by the Association in 1979.

**7.** In *American Hospital,* the district court excluded a class of free magazines, while including all paid subscriptions within "total circulation." Plaintiff's total circulation as construed by this court does not include free sample copies of plaintiff's magazine distributed by mail. Jt.Stip. ¶ 25.

**8.** This figure of 9,245 is very near the 9,342 figure reported to the Postal Service as "total paid circulation."

nizations." Plaintiff's Brief, filed May 2, 1988, at 20.

IRC § 512(a) provides:

[T]he term "unrelated business taxable income" means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) ... less the deductions allowed by this chapter which are directly connected with the carrying on of such trade or business....

In 1969, Congress amended § 513 and specifically included advertising income as an unrelated trade or business:

Advertising, etc., activities.—For purposes of this section, the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger complex of other endeavors which may, or may not, be related to the exempt purposes of the organization. Where an activity carried on for profit constitutes an unrelated trade or business, no part of such trade or business shall be excluded from such classification merely because it does not result in profit.

26 U.S.C. § 513(c). Thus, the IRC provides that the Association must pay tax on "unrelated business taxable income" subject to "the deductions allowed by this chapter." Section 513(c) makes it clear that selling advertising is a distinct business. Therefore, the Association must pay tax on gross income from advertising reduced only by deductions which are directly connected with the advertising activity.

Plaintiff cites *Rensselaer Polytechnic Institute v. Commissioner*, 732 F.2d 1058, 1062 (2d Cir.1984), and argues that Congress created the unrelated business in-

come tax to treat private businesses and competing tax-exempt institutions equally—without placing the tax-exempt institutions at a competitive disadvantage. To the contrary, Congress did not enact the Revenue Act of 1950 Ch. 944, 64 Stat. 906 to impose equality, but to prevent widespread abuses of the tax laws by tax-exempt organizations in profitable pursuits. The United States Supreme Court observed:

The statute was enacted in response to perceived abuses of the tax laws by tax-exempt organizations that engaged in profit-making activities. Prior law had required only that the profits garnered by exempt organizations be used in furtherance of tax-exempt purposes, without regard to the source of those profits.... As a result, tax-exempt organizations were able to carry on full-fledged commercial enterprises in competition with corporations whose profits were fully taxable.... Congress perceived a need to restrain the unfair competition fostered by the tax laws.

*United States v. American College of Physicians*, 475 U.S. 834, 837–38, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (1986) (citations omitted). The Court then held that Congress "struck a balance between its two objectives of encouraging benevolent enterprise and restraining unfair competition by imposing a tax on the 'unrelated business taxable income' of tax-exempt organizations." *Id.* at 838, 106 S.Ct. at 1594.

The Supreme Court later stated:

The undisputed purpose of the unrelated business income tax was to prevent tax-exempt organizations from competing unfairly with businesses whose earnings were taxed. H.R.Rep. No. 2319, 81st Cong., 2d Sess., 36 (1950); see *United States v. American College of Physicians*, 475 U.S. at 838 [106 S.Ct. at 1594].

*United States v. American Bar Endowment*, 477 U.S. 105, 114, 106 S.Ct. 2426, 2431, 91 L.Ed.2d 89 (1986).[9] Thus, the pur-

---

9. The remarks made during two days of debate in the House of Representatives clearly show that the 1950 Act was intended to restore competition and end abuses. In reporting on the

efforts by the Ways and Means Committee, Representative Simpson stated:

We all know there have been gross breaches of the law under which charitable and educational trusts and foundations have been giv-

pose of the 1950 Act was to prevent exploitation and to restore competition. Congress did not intend to equalize the treatment of tax-exempt and profit-making organizations. This court concludes, as have the majority of courts who considered the question, that the purpose of tax on unrelated business income is to prevent unfair competition by otherwise non-taxable businesses with their taxable counterparts. *Id.; American College*, 475 U.S. at 837, 106 S.Ct. at 1593–94; *Service Bolt & Nut Co. v. Commissioner*, 724 F.2d 519 (6th Cir.1983).

Plaintiff argues that there should be parity between exempt and non-exempt publishers and that the Association is at a disadvantage because "commercial publishers [may] deduct all readership costs." Pl.Br. at 7. This argument fails to consider that tax-exempt periodicals have sources of exempt income which are not available to non-exempt organizations. The circulation income of non-exempt organizations is subject to tax while the circulation income of the Association remains exempt. This court agrees with the reasoning of the district court in *American Medical*, 668 F.Supp. at 1102, which rejected the parity argument. Because its readership costs are allocated between circulation income and advertising income, the Association has no basis to claim a prejudicial lack of parity with non-exempt organizations.

In 1967, the Treasury issued regulations that clarified the meaning of the term "unrelated business taxable income." The regulation identified advertising in an exempt organization periodical as a "trade" or "business" even though the advertising was a part of a unified publishing activity. 26 C.F.R. § 1.513–1(b). This position was known as the fragmentation approach and was subject to widespread criticism because the statute supplied no support for

this policy. For this reason, the Court of Claims and the United States Court of Appeals for the First Circuit refused to enforce the fragmentation regulations. *See American College of Physicians v. United States*, 209 Ct.Cl. 23, 530 F.2d 930 (1976); *Massachusetts Medical Soc'y v. United States*, 514 F.2d 153 (1st Cir.1975). Congress responded to the criticism by endorsing in statute the Treasury's fragmentation approach. *American College*, 475 U.S. at 839, 106 S.Ct. at 1594–95. This endorsement appeared in the 1969 enactment of IRC § 513(c).

Congress made it clear that selling advertising in a tax-exempt organization's magazine is an unrelated business activity and subject to taxes. *Id.* at 840, 106 S.Ct. at 1595. The Supreme Court held that Congress ratified the Treasury's fragmentation approach:

> [Congress] declared unambiguously that the publication of paid advertising is a trade or business activity distinct from the publication of accompanying educational articles and editorial comment.

*Id.* at 839, 106 S.Ct. at 1594–95. Thus Congress enacted § 513(c) to tax the proceeds from advertizing income received by non-profit organizations. This tax prevented tax-exempt entities from exploiting their tax status in competition with taxable businesses.

In order to conform its regulations with the 1969 revisions to the unrelated business tax statute, the IRS published proposed new regulations in the Federal Register. This rule-making activity by the IRS followed the Congressional directive "to prescribe regulations indicating the appropriate methods for allocating income and expenses and other deductions which are attributable to the unrelated activity so as to clearly reflect unrelated business taxable income." S.Rep. No. 552, 91st Cong., 1st

---

en tax exemptions under certain circumstances. Those breaches generally resulted in a situation where the unit concerned would, in effect, sell its tax exemption, and would go into some business unrelated entirely with the purpose of the trust, and make money in competition with private industry. The committee has quite properly made changes in

this law which will have the effect of taxing those exempted organizations under certain sections of the Internal Revenue Code on those unrelated businesses which they operate.

96 Cong.Rec. 9,364 (1950); *see also* Comments at pp. 9357, 9365–66.

Sess. 76; *reprinted in* 1969 U.S.Code Cong. & Admin. News, 1645, 2027, 2105.

The proposed rules, first published in 1971, gave several factors to consider in allocating advertising income. IRS did not publish the rules until 1975; the final version contained three factors rather than the original seven. By changing the allocation rule to a mechanical application of three factors rather than balancing seven factors, the Treasury applied statutory intent and implemented the goal set forth by the proposed rules. If the Treasury had done otherwise, each case would have required a balancing of factors, with the result being diverse and conflicting outcomes based on similar facts. The application of a step-type analysis avoids this inequity, and insures fair and equal treatment of taxpayers by protecting against inconsistent results.

The Treasury's step-type approach is fully consistent with the IRC and reasonable. It implements Congressional intent to tax advertising activities and allows the Association to deduct the costs associated with producing the non-advertising portion of the magazine. The regulations therefore correctly define plaintiff's tax obligations.

### Jurisdiction

■ Finally, defendant asserts that this court lacks jurisdiction to decide plaintiff's claim that the IRS promulgated Treas.Reg. § 1.512(a)–1(f)(4) in violation of the APA and Treasury procedures. In briefing its motion for summary judgment, plaintiff argues for the first time that the IRS did not comply with applicable notice and comment procedures when promulgating the Treasury Regulations. When plaintiff first appealed to the Commissioner of the IRS (Commissioner), it argued that the regulations were invalid as applied and issued no challenge to the promulgation procedures.

This court lacks jurisdiction to consider plaintiff's APA argument because the Association failed to raise the argument in its refund claim to the Commissioner. The Association originally based its claim for refund on two contentions. First, plaintiff argued initially that the IRS erred in apply-

ing Treas.Reg. § 1.512(a) 1–(f)(4)(iii). Second, plaintiff contended "that the District Director erred in applying Treasury Regulation section 1.512(a)–1(f)(4) since said Regulation is invalid as applied to the Association, which had substantial sales of the Periodical to nonmembers." Defendant's Brief, filed July 21, 1988, Appendix at 6.

Nowhere does the refund claim mention the APA or assert that IRS violated APA's procedural requirements. The IRC does not permit such a variance between a claimant's arguments to the IRS and to a reviewing court:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax ... until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary....

26 U.S.C. § 7422(a). Treasury Regulations provide:

> The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof.

Treas.Reg. § 301.6402–2(b)(1).

The Claims Court has determined that a refund suit "may be maintained only upon the grounds shown in the refund application." *Pinckes v. United States*, 7 Cl.Ct. 570, 571 (1985); *see also, Northern Illinois Gas Co. v. United States*, 12 Cl.Ct. 84, 91 (1987); *Garvey, Inc. v. United States*, 1 Cl.Ct. 108, 117 (1983). This court's predecessor gave the rationale for this anti-variance rule:

> The reason for this is both to prevent surprise and to give adequate notice to the Commissioner of the nature of the claim, and its underlying facts, so that a thorough administrative investigation and determination can be made.

*Burlington Northern, Inc. v. United States*, 231 Ct.Cl. 222, 225, 684 F.2d 866, 868 (1982). This reaffirmed the court's previous decision in *Union Pacific Railroad Company v. United States*, 182 Ct.Cl. 103, 109, 389 F.2d 437, 442 (1968):

> If the claim for refund states only general grounds for relief, an item raised

in litigation but not specifically adverted to in the claim might be permitted if it is found that the taxpayer adequately alerted the service to the fact that the item is a ground for refund, or that the Commissioner considered that unspecified ground in reaching his decision on the items for which a refund was requested. *Id.* (citations omitted). Alleging that the regulation "is invalid as applied to the Association" does not constitute adequate notice to the Commissioner that the plaintiff is challenging IRS's compliance with the APA in adopting Treas.Reg. § 1.512(a)–1(f)(4). Rather, a challenge to the regulation "as applied" to plaintiff suggests a claim unique to the facts of plaintiff's case, not a general attack on the promulgation procedures. Plaintiff's terse "as applied" language does not provide the Commissioner with adequate notice of plaintiff's subsequent APA complaint. Therefore, 26 U.S.C. § 7422 operates to deprive this court of jurisdiction to entertain the APA claim.

### CONCLUSION

The Association used an incorrect method to calculate circulation income. Because less than 20% of the magazine's circulation in 1979 consisted of sales to nonmembers, the Association should have computed circulation income on the basis of the pro rata formula provided in § 1.512(a)–1(f)(4)(iii) of the Treasury Regulations. This regulation is an accurate and reasonable reflection of the IRC. Plaintiff's APA challenge to this Treasury Regulation is not considered by this court because plaintiff failed to raise the issue in its refund claim to the Commissioner.

Consequently, this court grants defendant's cross-motion for summary judgment and denies plaintiff's motion for summary judgment. The Clerk of the court is directed to enter judgment for the United States and to dismiss plaintiff's complaint.

No costs.